[Civ. No. 15338.   Second Dist., Div. One.   Oct. 22, 1946.]

DONALD C. PETERSON, a Minor, etc., Respondent, v. TWENTIETH CENTURY FOX FILMS (a Corporation), Appellant.

Schell & Delamer for Appellant.

Marion P. Betty for Respondent.

YORK, P. J.—This is an appeal from a judgment on the verdict, whereby plaintiff recovered $15,000 for injuries sustained by him under the following circumstances:

Respondent Peterson enlisted in the United States Navy in September of 1942, and at the time of his injury had the rating of motor fireman first class. Appellant was engaged in the production of a motion picture called "Guadalcanal Diary," and to add realism to one of the scenes which depicted the landing of marines, charges of explosives, known as "bombs" or "ash cans," were dropped overboard from a boat and detonated. On July 1, 1943, respondent was instructed by his commanding officer, Lieutenant Scoffield, to

report at the dock where his boat was moored and follow further instructions which would be given to him there. After respondent reached the dock, he received no further instructions from the Navy, and all the orders he took were given to him by representatives of appellant. Respondent was unaware that he was to work on a motion picture until he reached the dock, where he was met by a representative of appellant who told him to take his boat out, maneuver around an inactive boat, which was about a quarter of a mile from shore in the boat basin at Oceanside, California, unload some men from the inactive boat into his own boat, and take off. In accordance with such instruction, respondent boarded a 36-foot Higgins craft, accompanied by his crew of two men and two men from 20th Century Fox, named Chapman and McLaughlin, and proceeded to the inactive boat, circled it and unloaded approximately 16 marines from that boat into his own boat and started south toward San Diego. Respondent testified that "When we got about 20 or 30 yards away from the inactive boat was when we were supposed to push the charge off . . . at that time . . . I had the boathook in my hand from pulling alongside the other boat . . . and I was told to push the first charge off, which I did . . . with the boathook. . . . I was curious and I looked back . . . and I saw Mr. Chapman kneeling down over the battery with the wire in his hand and then I looked back at the bomb and it blew up and sent water up into the air . . . almost immediately after that they said 'push the second one off' . . . and I did, and I no sooner got it off the side than the boat went up . . . I mean the charge of dynamite blew over on the side of the boat. . . . At that time I was dazed and I remember being thrown from where I was standing, halfway over the side and somebody pulling me back in. . . . From then on I don't remember a thing until I was in the sick bay."

It was only a couple of seconds between the two explosions, the second of which caused respondent severe injuries, and occurred from 15 to 30 minutes after he had reported at the dock. The first bomb was detonated by touching the two points of the battery to the wires leading to the bomb. The second bomb exploded prematurely, the cause of such explosion being unknown. To the questions put by a juror and the court, respectively: "Who placed the charges, did the Navy boys place the charges or did the men from the studio? . . . Who placed the charges on the boat? Who prepared

them, the Navy men or the studio men?'', the respondent replied: ''The Navy didn't have a thing to do with it; it was all done by the 20th Century Fox.''

Only one ground of appeal is urged, i. e.: ''That the evidence established as a matter of law, that the plaintiff at the time of the accident involved in this case was a special employee of the defendant; that his injuries were therefore compensable under the provisions of the Labor Code (Workmen's Compensation Act) of this state, and that the Superior Court was without jurisdiction to hear or determine this case.''

An annotated article appearing in 150 American Law Reports at page 1456, in considering the problem ''whether a person in the military or naval service, including the state militia, is entitled to workmen's compensation,'' cites but one case dealing with the propounded question which it is therein stated, was revealed as the result of ''a diligent search,'' to wit: *Rector* v. *Cherry Valley Timber Co.*, (1921) 115 Wash. 31 [196 P. 653, 13 A.L.R. 1247], which is also cited by appellant in support of a reversal of the instant judgment. That case held that a soldier delegated by the government to assist in procuring lumber for governmental purposes in a logging camp was a workman within the provisions of the Workmen's Compensation Act and entitled to compensation for injuries, and therefore he could not maintain an action against the owner of the camp to recover damages for the injury. In the course of its opinion, the court stated (p. 654 [196 P.]): ''. . . the soldier by the voluntary act of joining the army . . . agreed to comply with every lawful order of his superior officers, and when that order was to engage in work designed to assist in the prosecution of the war, as provided by act of Congress, his appearance was voluntary. In any event, the respondent comes under the definition of a 'workman' laid down by the statute in relation to the compensation of workmen. . . . It was the intention of the Legislature to protect every one engaged in work in any of the extrahazardous industries of the state, whether he be soldier or civilian. . . .''

The cited case may be distinguished from the facts presented by the instant cause in that the Washington decision was based upon a special act of Congress, specifically authorizing the change of status of the soldier plaintiff to that of a civilian employee of the lumber company. The salary received

by such soldier was paid by the company pursuant to such special act of Congress which created an enforceable and valid contract by operation of law.

No evidence was offered herein to show that respondent received, or that he was intended to receive, any compensation for his assistance to appellant, nor that any consideration passed either to respondent or the Navy for such assistance. Respondent, as a member of the United States Navy, was under compulsion to obey the orders of his superior officers, but his obedience of the order given, to the effect that he should proceed to the dock and carry out the instructions there given by appellant, was not sufficient to create a contractual relationship between him and appellant for hire or for compensation.

Moreover, as stated in 1 Campbell on Workmen's Compensation, page 452, section 513: ''The Federal Government as the sovereign power is not subject to the compensation Acts of the various States. It is, however, subject to its own Acts.''

In *Goldstein* v. *State* (1939), 281 N.Y. 396 [24 N.E.2d 97], the court in rejecting the claim that a member of the state militia was entitled to workmen's compensation, stated: ''In determining whether particular persons or classes are covered it is necessary to consider the statute as a whole and the purpose embodied in the enactment. When so considered it seems to us to be apparent that it was never intended to cover militiamen while engaged in active service. There are many reasons which lead to that conclusion. Working men and women, employees and others, under our system of government, are free men and women. They have the same standing, rights and privileges possessed by other members of our body politic. They may work or not according to their own free will. If engaged in work they may quit working at any time, if they desire, without liability therefor, unless prevented by the terms of some express contract. They may organize labor unions for the purpose of improving their working conditions. They may engage in strikes against their employers to compel their employers to grant them certain rights or privileges which they deem themselves entitled to. . . . Upon the other hand, when a man becomes a member of the state militia he must, when in active service, surrender for the benefit of the state certain of the privileges enjoyed by workingmen who are employees. Under the military law . . . a member of the militia may be tried for various military

offenses, for acts which are not illegal under any other law. He may be tried and punished by a military tribunal and if found guilty may be punished by fines and in certain cases by imprisonment. He is at all times subject to the commands of his superior officers. He cannot quit while in active service without consent of his superiors. . . . It seems clear that one who joins the state militia and is engaged in active service therein is in no sense an employee of the state. He is simply performing a duty which he owes to the sovereign state as a resident and citizen. It makes no difference whether he does that voluntarily in time of peace or in response to a call of the governor in time of trouble.''

In *Hays* v. *Illinois Terminal Transp. Co.* (1936), 363 Ill. 397 [2 N.E.2d 309], it was held that the relation between the state and a member of the National Guard, who had been assigned to active duty to suppress riots and was injured in returning to his home, was essentially different from the relation which obtained between master and servant, because military service was based on the duty which every citizen owed to the sovereign and differed from ordinary employment in that an enlisted man could not terminate his service at will.

The relationship between respondent and the United States Navy in no sense could be denominated an employment. Therefore, by carrying out the orders of his superior officer to assist in the production of a moving picture, respondent did not thereby become a ''special employee'' of appellant within the meaning of the Workmen's Compensation Act.

For the reasons stated, the judgment appealed from is affirmed.

Doran, J., and White, J., concurred.