[Civ. No. 27105.   Second Dist., Div. One.   Aug. 21, 1963.]

KAREN TAYLOR VAN HORN et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION and CALIFORNIA POLYTECHNIC COLLEGE, Respondents.

460

Bacigalupi, Elkus & Salinger, Charles De Y. Elkus, Jr., and William G. Fleckles for Petitioner.

Everett A. Corten, Edward A. Sarkisian, T. Groezinger, Loton Wells and Carl Weber for Respondents.

THE COURT.—This is a proceeding to review an order of the Industrial Accident Commission which denied an application for death benefits to the widow and minor dependent children of Edward Gary Van Horn, who was killed on October 29, 1960, in an airplane crash while he was returning from Ohio to California with members of the football squad, officials and faculty of California State Polytechnic College in a plane provided by the college after the team, of which decedent was a member, had engaged in a regularly scheduled intercollegiate football game.

The sole question is whether decedent was an employee of the college within the meaning of the Workmen's Compensation Act so as to render the state liable thereunder for death benefits to his dependents.

There is no substantial dispute as to the facts. Decedent was an outstanding athlete in high school. The coach of the college was aware of his athletic record and advised him that he would recommend that he be given preference for a job on the college campus should be enroll there. Decedent enrolled at the college in September 1956, played on the football team during the fall term, and lived on campus. He was offered and he accepted work in the college cafeteria, for which credit was applied to his room rental. During the summer of 1957, he married. Thereafter he lived in Paso Robles and commuted to the college in San Luis Obispo, approximately 25 miles away. During the fall term of 1957 he did not participate

in football. His father, widow, and a friend testified that he indicated to them that he was generally dissatisfied with the football program and withdrew from it so that he would have time to work in order to support his family. His father testified that he, as manager of a flour mill, employed decedent part time and that decedent earned $500 during the football season of 1957.

In the spring of 1958 decedent resumed football activities, working out with the team in spring training. He told his father that he had been offered a "pretty good deal to play football . . . in order to support his family . . . he was going to have to get something to play football or he couldn't do it." He informed his wife that the coach had told him that if he would resume playing football he would receive assistance from the college of "$50.00 at the beginning of each school quarter and $75.00 rent money during the football playing season."

In September of 1958 and at the start of each school quarter thereafter decedent received a $50 check issued by the Treasurer of the state on behalf of the college. He received checks for three quarters in each school year. The checks contained the following notation: "Scholarship — $50.00 San Luis Obispo City." During the football season of 1958 he received additional checks totaling $75 directly from the coach drawn on an account in the coach's name, identified as "Special Account—Cal Poly Athletics Dept." During that football season decedent earned only $24 in part time work for his father. His father testified that he could have given him additional employment but decedent did not have the time to work while playing football. During the 1959 season the amount of the checks drawn on the special account by the coach in favor of decedent was increased to $100.

In the fall of 1960 decedent received the $50 check issued by the State Treasurer at the beginning of the fall quarter. He received a $50 check drawn by the coach about the time the team played its first game. He received a second $50 check drawn by the coach shortly before his death. His widow had the second check in her possession when she was notified of his death. She returned it to the coach, asking that he rewrite it to her order. The coach then sent her a check for $100. The coach explained that the extra $50 represented an advance of the quarterly payment to be made by the college at the beginning of the second quarter as prior to his death decedent

had requested, and he had promised decedent that he could have the payment in advance.

In the year 1960 decedent worked for the college athletic department, lining the football field, for which he was paid by the hour. With this exception, he did no work for the college after his first year there.

The annual total of $150, paid to decedent by the college in $50 quarterly payments, was denoted as "athletic scholarship." The funds were raised and contributed to the college by a group of alumni and business people of the San Luis Obispo community known as the Mustang Booster Club. As athletic director of the college, the coach periodically submitted to the booster club a requested budget containing the names of students he wished to have assisted during the ensuing school year. The funds contributed by the booster club were distributed by the college to students who qualified. To qualify, a student was required to maintain a 2.2 grade average while carrying 12 units of college courses, be a potential athlete, and be recommended by the coach to the scholarship committee. The coach recommended only those who were on the team. He had no power to overrule the scholarship committee or to terminate a scholarship before its term had elapsed. While no condition that the funds be used for tuition and books was imposed on recipients, the amount of the "scholarship" was based on the approximate cost of these items.

In explanation of the special account from which he personally paid sums to the athletes, the coach testified that a portion of the funds collected by the Mustang Booster Club was deposited directly in that account and was distributed by him to married members of the team who lived off campus. It had been the custom since before he came to the college some eleven years previously to provide these payments to married members of the athletic team to subsidize their rental expenses so as to make them comparable to the rates on campus. No condition that the funds be used for the payment of rent was imposed on the recipients. The dean of the college was cognizant of this program of financial assistance to athletes.

The college is a state college under the control of the Trustees of the California State Colleges. The trustees are authorized to accept any gift or donation of real or personal property whenever such gift and the terms and conditions thereof will aid in carrying out the primary function of the colleges. (Ed. Code, § 24000.) The primary function of the colleges is to

provide instruction at the undergraduate and graduate levels. (Ed. Code, § 22606.) The athletic program of California State Polytechnic College is a part of the curriculum and one-half unit of academic credit is earned for each quarter's participation on an athletic team. Decedent had earned the required academic credit for six quarters by the fall of 1959. He received additional credit in the spring of 1960 and would have received further additional credit for participation in football upon completion of the fall quarter of 1960.

Petitioners' contention is that decedent participated in the college football program under a contract of employment with the college. Respondents contend that decedent's participation in football was voluntary and the "scholarship" was a gift, not payment for services. The commission, after reconsideration, affirmed the referee's denial of benefits to petitioners and adopted his conclusions that decedent was not an employee of the college, there was no contract of employment or hire, and, in any event, playing on the college football team was not "rendering services" within the meaning of the Workmen's Compensation Act.

■ "The question of whether a worker is an employee within the meaning of the Compensation Act . . . is referred to as a question of mixed law and fact to be proved like any other question. [Citations.] It is a question of fact upon which the judgment of the commission is conclusive where the facts are in dispute. It becomes a question of law only when but one inference can reasonably be drawn from the facts. Where two opposing inferences may be drawn from the evidence, and the inference accepted by the commission is reasonable, and is supported by evidence in the record, that inference must be sustained." (*Schaller* v. *Industrial Acc. Com.*, 11 Cal.2d 46, 50-51 [77 P.2d 836].)

" 'Employee' means every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed, . . ." (Lab. Code, § 3351.) The state and all state agencies are employers subject to Workmen's Compensation liability. (Lab. Code, § 3300.)

■ If services are voluntarily rendered without compensation, there is no employment relationship. (*Edwards* v. *Hollywood Canteen*, 27 Cal.2d 802 [167 P.2d 729] [volunteer U.S.O. hostess gave services gratuitously; held: not an employee]; *Peterson* v. *Twentieth Century Fox Films*, 76 Cal.App.2d 587 [173 P.2d 851] [naval enlisted man directed

by superior officer to assist defendant in making motion picture; held: not an employee of defendant].) However, direct compensation in the form of wages is not necessary to establish the relationship so long as the service is not gratuitous. (*Union Lumber Co.* v. *Industrial Acc. Com.*, 12 Cal. App.2d 588 [55 P.2d 911] [vocational pupil learning trade as part of high school course; compensation paid to school authorities; held: pupil was employee of butcher shop]; *Gabel* v. *Industrial Acc. Com.*, 83 Cal.App. 122 [256 P. 564] [agreement to exchange labor].)

"Any person rendering service for another, other than as an independent contractor, or unless expressly excluded herein, is presumed to be an employee." (Lab. Code, § 3357.) This presumption, together with evidence of a contract of employment or hire, casts upon the alleged employer the burden of overcoming the presumption. (*Gale* v. *Industrial Acc. Com.*, 211 Cal. 137, 141 [294 P. 391].)

After a careful review of the evidence, we are of the opinion that the finding of the commission that there was no contract of employment is not supported by the evidence. The record reveals that petitioners established a prima facie case for benefits upon the presentation of evidence showing the alleged contract of employment. The coach, with whom it was shown that decedent made the alleged contract, testified at length; yet nowhere in his testimony is there a denial by him that he made a contract with decedent.

In *Gale* v. *Industrial Acc. Com.*, 211 Cal. 137, *supra*, a widow and minor children sought an award for death benefits, alleging that the husband and father, an airplane pilot, had been killed while engaged in flying an airplane in the employment of respondent. Upon the hearing before the commission, as in the instant case, certain witnesses testified that decedent had told them respondent would pay him for his services. However, unlike the situation in the present case, witnesses for the respondent categorically and positively denied that any contract or understanding of employment was ever entered into between decedent and respondent. The order of the commission denying relief was affirmed solely on the ground that the positive denial of any understanding or agreement for employment raised a material conflict in the evidence and the court had no authority to overrule the decision of the commission made on conflicting facts.

In view of the lack of contradictory testimony in the present record, we conclude that the finding of the commission

is contrary to the evidence. ▇ The opinion of the commission indicates that in support of this finding it relied on a written statement made by decedent in which he stated that he would like to play football at the college and planned to finance his way through school on a scholarship. From this statement the commission drew the inference that decedent did not consider himself to be an employee. The commission identifies this document as an application "for the scholarship." A reading of the record indicates that the document was an application prepared by the decedent for admission to the college in September 1956. Since the evidence submitted by petitioners was that the agreement between decedent and the coach was made after the football season of 1957, it is apparent that the document on which the commission relied has no probative value on the issue of whether the alleged contract was subsequently made and is insufficient to support any inference as to the relationship of the decedent to the college when he rejoined the team.

▇ As we have stated, the commission concluded that by playing football for the college the decedent was not "rendering services" within the meaning of the Workmen's Compensation Act. While the case is one of first impression in this jurisdiction, there is authority for the proposition that one who participates for compensation as a member of an athletic team may be an employee within the statutory scheme of the Workmen's Compensation Act. (*Metropolitan Casualty Ins. Co. of New York* v. *Huhn,* 165 Ga. 667 [142 S.E. 121] [professional baseball player]; *University of Denver* v. *Nemeth,* 127 Colo. 385 [257 P.2d 423] [state college football player].) ▇ The fact that academic credit is given for participation in the activity is immaterial. It has been held that one may have the dual capacity of student and employee in respect to an activity. In *Union Lumber Co.* v. *Industrial Acc. Com.,* 12 Cal.App.2d 588 [55 P.2d 911], it was held that a high school student taking a vocational training course and receiving credit therefor was an employee of a butcher shop while he was working in the job under a program in which the school authorities and the butcher shop cooperated to provide students an opportunity to practice their vocations. Student teachers and student nurses have been held to be employees. (See e.g., *State Comp. Ins. Fund* v. *Industrial Acc. Com.,* 22 Cal. Comp. Cas. 212; *Pacific Employers Insurance Co.* v. *Industrial Acc. Com.,* 9 Cal. Comp. Cas. 295.) ▇ The conclusion of the commission

is erroneous and, as a determination of law, is not binding on an appellate tribunal. *(Crown City Lodge, I.O.O.F.* v. *Industrial Acc. Com.,* 10 Cal.App.2d 83, 86-87 [51 P.2d 143]; *Reinert* v. *Industrial Acc. Com.,* 46 Cal.2d 349, 358 [294 P.2d 713].)

█ The commission also made the following finding: "The scholarship, when awarded, was for an entire year and was not dependent upon participating in sports. Even if the Deceased had not played in a single game, he still would have received the scholarship. Also, scholarships were awarded on scholastic records, rather than athletic prowess. The football coach was not consulted in passing on the applications." The record clearly contradicts these findings. The uncontradicted evidence was that to receive an athletic scholarship  a student must have maintained a 2.2 grade average while carrying 12 units, must be a member of an athletic team, and be recommended by the coach to the scholarship committee. He recommended only those who were on the team. There was evidence that the coach had no power to overrule the committee or to terminate a scholarship before the term for which it was granted had elapsed but that evidence does not support the inference that there was no relationship between the "scholarship" and decedent's athletic prowess or participation. The only inference to be drawn from the evidence is that decedent received the "scholarship" because of his athletic prowess and participation. █ The form of remuneration is immaterial. A court will look through form to determine whether consideration has been paid for services. *(Union Lumber Co.* v. *Industrial Acc. Com.,* 12 Cal.App.2d 588 [55 P.2d 911]; *Western Indemnity Co.* v. *Pillsbury,* 172 Cal. 807 [159 P. 721].)

█ The opinion of the commission sets forth the proposition that to conclude that one who has an athletic scholarship is an employee entitled to workmen's compensation benefits would impose a heavy burden on institutions of learning, would discourage the granting of scholarships, and, therefore, would be against public policy. We find no authority to the effect that an award in the present instance would be against public policy. On the contrary, the public policy of the state is declared in the Workmen's Compensation Act. *(Rideaux* v. *Torgrimson,* 12 Cal.2d 633 [86 P.2d 826].) █ All provisions of the workmen's compensation law should be liberally construed to effect the law's beneficent purposes. *(Colonial Ins. Co.* v. *Industrial Acc. Com,* 27 Cal.2d 437, 439 [164 P.2d 490].) █ The theory of the

compensation act as to death cases is that the dependents of the employee killed through some hazard of his employment shall be compensated for the loss of the support they were receiving from him at the time of his death. (*Spreckels Sugar Co.* v. *Industrial Acc. Com.*, 186 Cal. 256 [199 P. 8].)

Where there is any reasonable doubt as to the jurisdiction, the courts must resolve such doubts in favor of jurisdiction of the commission. (*Scott* v. *Pacific Coast Borax Co.*, 140 Cal.App.2d 173 [294 P.2d 1039].)

The Workmen's Compensation Act is, in effect, a socially-enforced bargain which compels an employee to give up his valuable right to sue in the courts for full recovery of damages under common-law theories in return for a certain, but limited, award. It compels the employer to give up his right to assert common-law defenses in return for assurance that the amount of recovery by the employee will be limited. In the evolution of workmen's compensation legislation and case law there has been an increasing recognition of its purpose to distribute the risk of service-connected injuries or death by charging all enterprises with the costs and not merely those enterprises which produce saleable products and which can therefore transfer the cost of injuries to the consumers of products. Thus, churches, charitable organizations, nonprofit hospitals, universities and other large, publicly supported institutions have been held to be employers within the meaning of the Workmen's Compensation Act. (See, e.g., *California Comp. Ins. Co.* v. *Industrial Acc. Com.*, 118 Cal.App.2d 653 [253 P.2d 78]; *State Comp. Ins. Fund* v. *Industrial Acc. Com.*, 124 Cal.App.2d 1 [268 P.2d 40]; *State of California* v. *Industrial Acc. Com.*, 196 Cal.App.2d 10 [16 Cal.Rptr. 323].)

It cannot be said as a matter of law that every student who receives an "athletic scholarship" and plays on the school athletic team is an employee of the school. To so hold would be to thrust upon every student who so participates an employee status to which he has never consented and which would deprive him of the valuable right to sue for damages. Only where the evidence establishes a contract of employment is such inference reasonably to be drawn. *State Comp. Ins. Fund* v. *Industrial Com.*, 135 Colo. 570 [314 P.2d 288], cited by respondents, is a case in which a member of a college football team received a scholarship for tuition. There the evidence did not establish a contract of hire to play football and thus did not support a finding of an employee-employer relationship.

The commission also made a finding that "the evidence is not clear as to the identity of the employer" and that "the alumni association which raised the money for the scholarship or the student body might just as well have been the employer, if not more logically so." The record reveals that the fifty-dollar checks received by the decedent were issued by the college, that the coach was a member of the college faculty in control of the athletic activities, and that the football team represented the college in intercollegiate games. There is no uncertainty in the record. The fact that the funds were contributed by the Mustang Booster Club is not determinative of who is the employer. (*State Comp. Ins. Fund* v. *Industrial Acc. Com.*, 124 Cal.App.2d 1 [268 P.2d 40] [special nurse of polio patient held to be employee of hospital although services paid for by a separate entity which received the money from the National Foundation for Infantile Paralysis] ; *Department of Natural Resources* v. *Industrial Acc. Com.*, 216 Cal. 434 [14 P.2d 746] [applicant held to be employee of Fish & Game Commission although paid by a commercial fisherman] ; *County of Los Angeles* v. *Industrial Acc. Com.*, 123 Cal.App. 12 [11 P.2d 434] [deputy marshal held to be employee of City of Los Angeles although paid by county] ; *Claremont Country Club* v. *Industrial Acc. Com.*, 174 Cal. 395 [163 P. 209, L.R.A. 1918F 177] [caddy held to be employee of country club although paid by person he served].)

For the reasons set forth above, the order of the commission is annulled. The matter is remanded to the commission for further proceedings consistent herewith.

A petition for a rehearing was denied September 19, 1963, and respondents' petition for a hearing by the Supreme Court was denied October 16, 1963. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.