[No. B018728. Second Dist., Div. Two. May 21, 1987.]

RAYMOND ANTHONY TOWNSEND, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

COUNSEL

Eisfelder & Eliaser and James R. Eliaser for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Marvin Goldsmith, Senior Assistant Attorney General, Robert H. Francis and Marsha S. Miller, Deputy Attorneys General, for Defendants and Respondents.

OPINION

COMPTON, Acting P. J.—In a varsity basketball game between the University of California at Los Angeles (UCLA) and San Jose State University (San Jose State), a player for San Jose State, Ronald Lowe, struck a UCLA player, Raymond Townsend, with his fists and inflicted physical injury. In a personal injury action filed by Townsend against Lowe and various other defendants, a jury awarded Townsend $25,000 as against Lowe.

Before the matter was submitted to the jury, however, the trial court determined as a matter of law that defendant Lowe was not an employee of the State of California (State) and thus Townsend could not recover under the doctrine of respondeat superior against the other named defendants, i.e., the State, the athletic director and the coach at San Jose State.[1]

Townsend has appealed contending essentially that, since intercollegiate athletics are "big business" and generate large revenues for the institutions who field teams in such competition, the athletes who represent those institutions should be considered to be employees or agents of those institutions under the doctrine of respondeat superior.

In determining the motion for summary adjudication, the trial court had before it, in addition to the pleadings, a declaration by the coach at San Jose State that Lowe was a student at the school and was not provided a scholarship or any other compensation for playing basketball. Plaintiff offered no evidence on the issue at the time of the hearing on the motion.

On a motion to reconsider, however, plaintiff proffered a declaration by a member of the San Jose State basketball team to the effect that the players' transportation, meals and hotel expenses were paid for when playing away from home. Plaintiff offered no evidence as to how the basketball program at San Jose State was financed or just what revenues the school received from the sport.

The issue was properly determined in summary proceedings. The facts are not in dispute. The question is purely one of law. (*Golden West Broadcasters Inc.* v. *Superior Court* (1981) 114 Cal.App.3d 947 [171

---

[1]The trial court determined the issue on a motion for summary adjudication of issues under Code of Civil Procedure section 437c, subdivision (f), which section provides: "A party may move for summary adjudication of issues, either by itself or as an alternative to summary judgment. If it appears that the proof supports the granting of the motion for summary adjudication as to some but not all the issues involved in the action, or that one or more of the issues raised by a claim is admitted, or that one or more of the issues raised by a defense is conceded, the court shall, by order, specify that those issues are without substantial controversy. . . ."

Cal.Rptr. 95]; *Sherar v. B & E Convalescent Center* (1975) 49 Cal.App.3d 227 [122 Cal.Rptr. 505]; *Pittman v. Pedro Petroleum Corp.* (1974) 42 Cal.App.3d 859 [117 Cal.Rptr. 220].)

In this, as in any type of case, the liability of the State and its supervisory employees is governed primarily by the California Tort Claims Act. (Gov. Code, § 810 et seq.) Government Code section 815 provides: "Except as otherwise provided by statute: (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." The legislative committee comment to that section states in part: "This section abolishes all common law or judicially declared forms of liability for public entities, . . . public entities may be held liable only if a statute . . . is found declaring them to be liable. . . . [T]he practical effect of this section is to eliminate any common law governmental liability for damages arising out of torts. . . ."

Thus, plaintiff's claim against the State rests on the applicability of Government Code section 815.2, which states in relevant part: "(a) A public entity is liable for injury proximately caused by an act or omission of an *employee* of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." (Italics added.)

The term "employee" as used in the above referenced section is defined in Government Code section 810.2 as follows: " 'Employee' includes an officer, judicial officer as defined in Section 28 of the Elections Code, employee, or servant, whether or not compensated, but does not include an independent contractor."

The legislative comment to section 810.2 states in relevant part: " 'Employee' was originally defined (in the bill as introduced) to include 'an officer, agent or employee,' but not an 'independent contractor.' By amendment, the word 'servant' was substituted for 'agent' because (1) 'servant' was considered more appropriate than 'agent' when used in a statute relating to tort liability and (2) the public entities feared that to impose liability upon public entities for the torts of 'agents' would expand vicarious liability to include a large indefinite class of persons and 'servant' was believed to be more restrictive than 'agent.' The words 'whether or not compensated' are taken from a somewhat similar definition of 'employee' found in the Federal Tort Claims Act (28 U.S.C. § 2671)."

The provision in Government Code section 810.2 that employment may be gratuitous simply recognizes the fact that some government officers

serve without compensation. It does not expand the concept of "employment."

■ Whether, in the context of the doctrine of respondeat superior, a student-athlete is an employee of the school he represents, appears to be a question of first impression.

The Attorney General, in seeking to prevent the imposition of liability on the State, attaches considerable significance to the fact that Lowe was not on a scholarship and further relies heavily on the concept that, under the Tort Claims Act, the State's liability is more restricted than is the case of a nongovernmental defendant.

In our opinion, however, the issue is of sufficient significance to be determined on a broader basis and that the result should be the same whether or not the student-athlete is on a scholarship or whether he or she is representing a public or private institution.

■ Although the doctrine of respondeat superior itself, as it has developed, has been justified on various grounds, it has, in recent times, been recognized as a rule of policy—"a deliberate allocation of a risk." (*Hinman* v. *Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 959 [88 Cal.Rptr. 188, 471 P.2d 988].)

Applicability of the doctrine in any given case, however, still requires an individualized determination of whether a master-servant relationship exists between the tortfeasor and the defendant on which plaintiff seeks to impose vicarious liability.

The Restatement Second of Agency section 220, subdivision (2)(a) sets forth criteria or factors to be considered in making this latter determination as follows: ". . . the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) *whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business.*" (Italics added.)

Comment c of that section states: "The relation of master and servant is one not capable of exact definition. It is an important relation in that upon it depends the liability of the master to third persons and to his employees under the provisions of various statutes as well as under the common law; the relation may prevent liability, as in the case of the fellow servant rule. It cannot, however, be defined in general terms with substantial accuracy. The factors stated in Subsection (2) are all considered in determining the question, and it is for the triers of fact to determine whether or not there is a sufficient group of favorable factors to establish the relation. [Citation.] If the inference is clear that there is, or is not, a master and servant relation, it is made by the court; otherwise the jury determines the question after instruction by the court as to the matters of fact to be considered."

The Restatement ultimately defines servant as ". . . [a] person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." (Rest.2d. Agency, § 220, subd. (1).)

But finally Dean Prosser describes that definition and the restatement approach as "[A] great over-simplification of a complex matter. . . . [I]t is probably no very inaccurate summary of the whole matter to say that the person employed is a servant when, *in the eyes of the community,* he would be regarded as a part of the employer's own working staff, and not otherwise." (Prosser & Keeton on Torts (5th ed. 1984) § 70, p. 501, italics added.) We recognize that the foregoing analysis is aimed at distinguishing between an employce and an independent contractor and that the relationship between a school and a student-athlete is a unique one which probably does not fit neatly into that dichotomy. It is fair to state, however, that any determination of this issue even in the more familiar context is affected by policy considerations.

■ Of course the statutory law is a primary source of public policy declarations, and one of the most significant modern adjuncts of the employer-employee relationship is the workers compensation scheme. Hence, the Legislature's definition of "employee" in that area is of great significance in analyzing the issue confronting us.

In *Van Horn* v. *Industrial Acc. Com.* (1963) 219 Cal.App.2d 457 [33 Cal.Rptr. 169], a member of the football team at California Polytechnic Institute at San Luis Obispo who had been receiving direct financial assistance from a fund created by a private booster club, as well as from the school itself, was killed in an airplane accident while traveling with the team. His widow sought benefits under the workers' compensation law.

The Court of Appeal held that, under the circumstances, the evidence supported a finding that there existed a contract of employment between the school and the deceased and that the widow was entitled to benefits under the workers' compensation law.

In its opinion, however, the court was careful to point out that "[i]t cannot be said as a matter of law that every student who receives an 'athletic scholarship' and plays on the school athletic team is an employee of the school. To so hold would be to thrust upon every student who so participates an employee status to which he has never consented and which would deprive him of the valuable right to sue for damages. Only where the evidence establishes a contract of employment is such inference reasonably to be drawn." (*Van Horn* v. *Industrial Acc. Com., supra,* at p. 467.)

Subsequently, the Legislature amended the Labor Code to add subdivision (k) to section 3352, excluding from the definition of employee, "Any student participating as an athlete in amateur sporting events sponsored by any public agency, public or private nonprofit college, university or school, who receives no remuneration for such participation other than the use of athletic equipment, uniforms, transportation, travel, meals, lodgings, scholarships, grants-in-aid, or other expenses incidental thereto." That exclusion has been applied retroactively in a case of a student-athlete on a scholarship. (*Graczyk* v. *Workers' Comp. Appeals Bd.* (1986) 184 Cal.App.3d 997 [229 Cal.Rptr. 494].)

It is a matter of common knowledge that colleges and universities in California, in varying degrees, maintain athletic programs which include a number of sports, such as golf, tennis, swimming, track, baseball, gymnastics and wrestling. It is also well known that of all of the various sports programs, at least in California, only two, i.e., basketball and football, generate significant revenue. These revenues in turn support the other nonrevenue producing programs.

Thus, conceptually, the colleges and universities maintaining these athletic programs are not in the "business" of playing football or basketball any more than they are in the "business" of golf, tennis or swimming. Football and basketball are simply part of an integrated multisport program which is part of the education process. Whether on scholarship or not, the athlete is not "hired" by the school to participate in interscholastic competition. (See *State Compensation Ins. Fund* v. *Industrial Com.* (1957) 135 Colo. 570 [314 P.2d 288].)[2]

---

[2]Education Code section 89230 provides in part: " 'Instructionally related activities' means those activities and laboratory experiences which are at least partially sponsored by an

From the standpoint of public policy consideration, exposing those institutions to vicarious liability for torts committed in athletic competition would create a severe financial drain on the State's precious educational resources. We have no doubt that this was one of the considerations which led to the amendment of Labor Code section 3352 and that that amendment evidenced an intent on the part of the Legislature to prevent the student-athlete from being considered an employee of an educational institution for any purpose which could result in financial liability on the part of the university.

We thus conclude that as a matter of law Lowe was not an employee of the State or the university and hence liability for his tortious conduct could not be vicariously imposed on the State or its supervisory employees.

The judgment is affirmed.

Gates, J., and Fukuto, J., concurred.

A petition for a rehearing was denied June 10, 1987, and appellant's petition for review by the Supreme Court was denied August 12, 1987.

---

academic discipline or department and which are, in the judgment of the president of a particular campus, with the approval of the trustees, integrally related to its formal instructional offerings. [¶] Activities which are considered to be essential to a quality educational program and an important instructional experience for any student enrolled in the respective program may be considered instructionally related activities. [¶] Instructionally related activities include, but are not limited to: (a) Intercollegiate athletics: costs which are necessary for a basic competitive program including equipment and supplies and scheduled travel, not provided by the state. Athletic grants should not be included."