[No. H003515. Sixth Dist. May 2, 1989.]

CITY OF SANTA CRUZ, Plaintiff and Appellant, v.
SANTA CRUZ CITY SCHOOLS BOARD OF EDUCATION,
Defendant and Respondent.

COUNSEL

Atchison & Anderson and Gerald D. Bowden for Plaintiff and Appellant.

Bergman & Wedner, Richard V. Godino and Kristi Sjohlm-Sierchio for Defendant and Respondent.

OPINION

CAPACCIOLI, J.—

### Statement of the Case

Plaintiff City of Santa Cruz (City) appeals from a judgment upholding a resolution by defendant Santa Cruz City Schools Board of Education (Board) that exempts the replacement of lighting fixtures on Santa Cruz High School's Memorial Field from the City's zoning controls. Plaintiff

claims the exemption was not authorized under Government Code section 53094 and, therefore, was arbitrary and capricious.[1] We affirm the judgment.

*Facts*

Memorial Field at Santa Cruz High School is a multi-use facility. The original lighting system was installed in the 1940's. It consisted of 11 incandescent lights on wooden poles approximately 60 feet high. The poles were located at the edge of the playing field. These lights provided uneven illumination of the field and glare problems for players and officials, and the poles were a potential safety hazard to players who strayed out of bounds. Indeed, in 1984, the Officials' Association of Santa Cruz Coast Athletic League informed school officials they would no longer officiate evening games at Memorial Field because the conditions of the lighting posed significant safety hazards for the players. In addition, nine of the wooden poles had evidence of termite damage and/or decay.

As of the early 1980's, school officials knew the lighting system needed renovation. In 1985, booster clubs from Santa Cruz and Harbor High Schools organized a committee to raise funds and volunteer time, skills, and labor for the Memorial Field renovation project. Thereafter, plans were drawn to install four 90-foot aluminum poles with metal halide lights.

Although school officials did not believe a permit for the replacement lights was needed, they learned on March 5, 1986, the day before their scheduled installation, that the City considered a permit necessary. The poles were installed, and later on March 11, a permit was approved. However, it was appealed by neighbors, who objected to the increased height of the light poles. In July, the City's zoning board granted the appeal and revoked the permit. School officials then appealed this decision to the city

---

[1] Government Code section 53094 provides, in relevant part, "[T]he governing board of a school district, by vote of two-thirds of its members, may render a city or county zoning ordinance inapplicable to a proposed use of property by such school district except when the proposed use of the property by such school district is for *nonclassroom facilities, including, but not limited to, warehouses, administrative buildings, automotive storage and repair buildings.* The board shall, within 10 days, notify the city or county concerned of such action. If such governing board has taken such action the city or county may commence an action . . . seeking a review of such action of the governing board of the school district to determine whether it was arbitrary and capricious. . . . If the court determines that such action was arbitrary and capricious, it shall declare it to be of no force and effect, and the zoning ordinance in question shall be applicable to the use of the property by such school district." (Italics added.)

Unless otherwise specified, all further statutory references are to the Government Code.

council, which ruled that the lights had to be removed within six months and replaced with six 60-foot poles.

During the next six months, various lighting studies were done indicating that sixty-foot poles would not provide adequate lighting. In January 1987, school officials applied for a permit to install 74-foot poles. However, the permit was denied as was their appeal of the denial.

Thereafter, in February 1987, the Board voted to exempt the lighting renovation from the City's zoning ordinances under section 53094. The City then commenced this action to reverse the Board's decision. The trial court concluded the Board's action was proper and denied relief.

*Discussion*

The City contends that Memorial Field with its new stadium lights is not subject to exemption. It cites the definition of "classroom" from no less than 13 dictionaries, including ones from Canada and Australia, and argues that "classroom" can only mean "a *room* in a school building." Consequently, it argues that Memorial Field is a nonclassroom facility.

The City's argument is flawed because it focuses on the "room" in "class*room*." However, section 53094 does not, in fact, use the word "classroom" either as a noun or by itself. Rather, the statute uses the phrase "nonclassroom facilities."

Webster's Third New International Dictionary (1981) defines "facility" as "something that promotes the ease of any action, operation, transaction, or course of conduct[;] . . . something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end." (*Id*. at pp. 812-813.) It is beyond reasonable argument that Memorial Field, including its new lights, is a "facility" of some sort in that it promotes a variety of activities and serves many functions. Thus, the question is whether it is a "nonclassroom" facility.

While there may be universal agreement as to the definition of *a* "classroom," the meaning of the adjective "nonclassroom" is not, in our view, equally well settled in the English speaking world. Therefore, it is proper and necessary to interpret it.

According to established principles, our first task is to ascertain the intent of the Legislature so as to effectuate the purpose of the law, looking

first to the words of the statute themselves, giving them their usual, ordinary import, and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) "When the language is susceptible of more than one reasonable interpretation, however, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].)

■ Section 53094 is part of a legislative reaction to *Hall* v. *City of Taft* (1956) 47 Cal.2d 177 [302 P.2d 574] and its offspring *Town of Atherton* v. *Superior Court* (1958) 159 Cal.App.2d 417 [324 P.2d 328]. (See *Baldwin Park County Water Dist.* v. *County of Los Angeles* (1962) 208 Cal.App.2d 87, 95-96 [25 Cal.Rptr. 167]; see also Note, *Empty Corridors: The Legal Aspects of the Closure and Sale of Surplus Public Schools* (1976) 16 Santa Clara L.Rev. 595, 597-599.)

In *Taft, supra,* the California Supreme Court broadly proclaimed that when the state "engages in such sovereign activities as the construction and maintenance of its buildings . . . it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulation." (47 Cal.2d at p. 183.) It then specifically held that the city's building code did not apply to school district plans to construct a new school because "public schools of this state are a matter of statewide rather than local or municipal concern" and "their establishment, regulation and operation are covered by the Constitution and the state Legislature is given comprehensive powers in relation thereto." (*Id.* at pp. 179, 188.)

Thereafter, in *Town of Atherton, supra,* 159 Cal.App.2d 417, the court applied *Taft,* holding that school districts were exempt from municipal zoning ordinances.

The broad language in *Taft* appeared to immunize all state agencies from local regulatory control, creating potential problems for local governments as well as the state, which suddenly had to assume regulatory and supervisorial responsibilities previously shouldered by local governments. Consequently, the Legislature, in effect, consented to local regulation by adopting article 5, "Regulation of Local Agencies by Counties and Cities," in chapter 1, title 5 of the Government Code, sections 53090 through 53095. (Stats. 1959, ch. 2110, § 1, pp. 4907-4909; see generally Problems of Local Govern-

ment Resulting from the *Hall* v. *City of Taft* Case Decision, 6 Assem. Interim Com. Rep. No. 8, Municipal and County Government (1959) p. 7, 1 Assem. J. Appen. (1959).)

Section 53090, inter alia, first defines "local agency" as "an agency of the State for the local performance of governmental or proprietary function within limited boundaries." Section 53091 generally provides that "Each local agency shall comply with all applicable building ordinances and zoning ordinances of the county or city in which the territory of the local agency is situated."[2] However, section 53094, as originally enacted, gave school districts blanket authority to exempt any and all uses of school district property from local zoning ordinances as long as such exemptions were not arbitrary and capricious. (See Stats. 1959, ch. 2110, § 1, p. 4909.)[3]

In light of *Hall* v. *City of Taft, supra,* 47 Cal.2d 177, these statutes reflect a determination that in general the interests served and benefits gained by local regulation of state agencies outweigh any interference such regulation may have on the functions performed by those agencies. Nevertheless, in enacting former section 53094, "it appears that the Legislature deliberately accorded different treatment to school districts than to other local agencies because it was well aware that school construction was subject to almost complete control by the state." (*City of Santa Clara* v. *Santa Clara Unified Sch. Dist.* (1971) 22 Cal.App.3d 152, 158, fn. 3 [99 Cal.Rptr. 212].) Despite this different treatment, the Legislature implicitly disagreed with the specific holding in *Taft*, i.e., that school districts are *absolutely* immune from local control, concluding instead that state educational policy should not automatically prevail over local regulatory concerns. Rather a school board decision to exempt itself from local regulation is subject to public and judicial scrutiny and reversal if found to be arbitrary and capricious. Thus, rather than grant absolute immunity from or give unqualified consent to local control, the Legislature in section 53094 struck a balance, though not equal, between state educational and local regulatory interests and control.

The Legislature has since fine-tuned this balance. In 1965, it amended former section 53094 to preclude exemptions for offsite "nonclassroom facilities," that is, "when such nonclassroom facilities will not be located

---

[2] This section, however, specifically exempts certain water and energy facilities from local building and zoning ordinances.

[3] Not pertinent here are section 53092, which authorizes the delegation of certain powers of the State Division of Architecture to the county or city; or former section 53093, which related to appeals by local agencies aggrieved by application of a local zoning ordinance but has since been repealed (see Stats. 1970, ch. 172, § 23, p. 418); or section 53095, which provides that sections 53090 through 53095 shall prevail over certain specified sections of the Education and Government Codes.

upon, or adjacent to, or contiguous to land used for classroom facilities." (Stats. 1965, ch. 1538, § 1, p. 3629.) In 1976, the Legislature completely eliminated this offsite qualification and thus precluded exemptions for all "nonclassroom facilities." (Stats. 1976, ch. 760, § 1, p. 1797.) In 1984, the Legislature again amended this section but not in a way pertinent to our discussion. (See Stats. 1984, ch. 657, § 1, p. 2420.) Also in 1984, however, the Legislature enacted section 53097, which, inter alia, requires school boards to comply with local controls concerning drainage, roads, and grading.[4]

Although the current law concerning which agencies have to follow what local regulations is a tangle of prohibitions and exceptions, lacking a single, articulable organizing principle, the amendments to section 53094 do suggest a legislative conclusion that the relationship between school boards and their "nonclassroom facilities" is not significantly different from the relationship between other state agencies and their property, which, in fact, could also be characterized as "nonclassroom facilities," and therefore, state educational policy does not reasonably or logically justify continued permission for school boards to exempt their "nonclassroom facilities" from local control. As to what "nonclassroom facilities" are, the legislative genealogy of section 53094 further suggests that "nonclassroom facilities" are those that are not by their nature so directly or sufficiently related to a school board's unique function as to distinguish it from any other local agency.

The statute itself confirms and helps clarify this suggestion by enumerating instructive examples of "nonclassroom facilities." The statute lists "warehouses, administrative buildings, [and] automotive storage and repair buildings[.]" These facilities have nothing directly to do with *classroom* activities. Rather, they are devoted completely to ancillary, noninstructional functions. Thus, we perceive in section 53094 an intention to distinguish between instructional and support facilities. Accordingly, we consider it reasonable and consistent with the legislative history and purpose of section 53094 to interpret "nonclassroom facilities" to mean those not directly used for or related to student instruction. (Cf. § 53096.)[5] Moreover, this interpre-

---

[4] This statute apparently was a response to an occurrence where storm water runoff from a school site in San Bernardino County allegedly caused damage to surrounding properties. County officials claimed that the problem occurred due to faulty design and lack of adequate grading, which, had the school district complied with local ordinances, could have been avoided. (See Staff Analysis of Sen. Bill No. 1681, Assem. Local Government Com., Dominic L. Cortese, Chairman (June 27, 1984) p. 2.)

[5] Section 53096, which was added to article 5 in 1977 (Stats. 1977, ch. 435, § 2, p. 1468), provides, inter alia, that local agencies with responsibility for the storage and transmission of water and electricity may under certain circumstances render local zoning ordinances inap-

tation preserves the balance in section 53094 between the state's strong interest in public education and the value of local zoning controls.

With this interpretation of "nonclassroom facilities" in mind, we turn to the question of whether Memorial Field, including its lights, is a "nonclassroom facility." Specifically, is there substantial evidence to support the trial court's implicit finding that the field is used for or directly related to student instruction?

In their declarations, Dale Kinsley, Superintendent of Schools for the Santa Cruz City Schools, Hilding Ronning, athletic director at Santa Cruz High School, and Barbara Kingsby, former principal of Santa Cruz High School until 1987, stated that Memorial Field primarily is used for physical education classes, interscholastic athletics, spirit activities, and band performances. "Seventeen competitive sports are offered" and during "the fall semester of the 1986-1987 school year 365 students were enrolled in 'p.e. team' (or athletics) in six different sports. In addition another 125 students participate in band." These activities "are an integral part of the educational program at the high school," and students receive academic credit for their participation. Lights are necessary on the field because many football and soccer games as well as band and "spirit leader" activities must be scheduled on weekday evenings.

In another declaration, Damon G. Nalty, a professor, director, and chairman of the social science department and program at San Jose State University, stated that "athletics and musical activities such as the marching band do not 'fit' into a classroom. These educational activities at San Jose State are offered and occur on the campus grounds. It is well known and accepted among educators that sports, music and drama are an integral and vital part of an educational program. Such activities, although frequently not confined to traditional classrooms, can and do enhance the academic or educational achievements of students."

In our view, this evidence is sufficient to support a finding that Memorial Field serves an important educational purpose at Santa Cruz High and is directly used for student instruction. Although the particular sort of instruction, especially evening interscholastic athletic competition, may appear to be extracurricular activity, we note our Supreme Court has itself observed in a different context that so called "extracurricular activities"

---

plicable "except when the proposed use of the property by such local agency is for facilities *not related to* storage or transmission of water or electrical energy, including, but not limited to, warehouses, administrative buildings or automotive storage and repair buildings." (Italics added.)

such as sports and drama, are an integral and vital part of an educational program and that they are "educational" within the free education guaranteed by the California Constitution. (*Hartzell* v. *Connell* (1984) 35 Cal.3d 899, 910-911 [201 Cal.Rptr. 601, 679 P.2d 35].) "In addition to the particular skills taught, group activities encourage active participation in community affairs, promote the development of leadership qualities, and instill a spirit of collective endeavor. These results are directly linked to the constitutional role of education in preserving democracy, as set forth in article IX, section 1, [of the California Constitution]." (*Ibid.*)

In light of our discussion, it is clear the Board's exemption was not "arbitrary and capricious" and, therefore, the trial court did not abuse its discretion denying the City's petition for relief.[6]

The judgment is affirmed.

Brauer, Acting P. J., and Premo, J., concurred.

---

[6] Given our conclusion, we need not address the Board's claims that petitions for certiorari and administrative mandamus were not the proper vehicles for the City to use in seeking to reverse the exemption.