[No. S119575. Apr. 6, 2006.]

JOSE LUIS AVILA, Plaintiff and Appellant, ·v.
CITRUS COMMUNITY COLLEGE DISTRICT, Defendant and Respondent.

## Counsel

Law Offices of Alan E. Wisotsky and Brian P. Keighron for Plaintiff and Appellant.

Gibeaut, Mahan & Brisco, Gary Robert Gibeaut, John W. Allen and Lisa J. Brown for Defendant and Respondent.

## Opinion

**WERDEGAR, J.**—During an intercollegiate baseball game at a community college, one of the home team's batters is hit by a pitch. In the next half-inning, the home team's pitcher allegedly retaliates with an inside pitch and hits a visiting batter in the head. The visiting batter is injured, he sues, and the courts must umpire the dispute.

We are asked to make calls on two questions: (1) Does Government Code section 831.7, which immunizes public entities from liability for injuries sustained during "hazardous recreational activities," bar recovery against the home community college district, and (2) if not, does the community college district owe any duty to visiting players that might support liability? We conclude that section 831.7 does not extend to injuries sustained during supervised school sports, but that on the facts alleged the host school breached no duty of care to the injured batter. We reverse the judgment of the Court of Appeal.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

Jose Luis Avila, a Rio Hondo Community College (Rio Hondo) student, played baseball for the Rio Hondo Roadrunners. On January 5, 2001, Rio Hondo was playing a preseason road game against the Citrus Community College Owls (Citrus College). During the game, a Roadrunners pitcher hit a Citrus College batter with a pitch; when Avila came to bat in the top of the next inning, the Citrus College pitcher hit him in the head with a pitch, cracking his batting helmet. Avila alleges the pitch was an intentional "beanball" thrown in retaliation for the previous hit batter or, at a minimum, was thrown negligently.

---

[1] Because this appeal is from the sustaining of a demurrer, we take the facts recited in Avila's complaint as true. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

Avila staggered, felt dizzy, and was in pain. The Rio Hondo manager told him to go to first base. Avila did so, and when he complained to the Rio Hondo first base coach, he was told to stay in the game. At second base, he still felt pain, numbness, and dizziness. A Citrus College player yelled to the Rio Hondo dugout that the Roadrunners needed a pinch runner. Avila walked off the field and went to the Rio Hondo bench. No one tended to his injuries. As a result, Avila suffered unspecified serious personal injuries.

Avila sued both schools, his manager, the helmet manufacturer, and various other entities and organizations. Only the claims against the Citrus Community College District (the District) are before us. Avila alleged that the District was negligent in failing to summon or provide medical care for him when he was obviously in need of it, failing to supervise and control the Citrus College pitcher, failing to provide umpires or other supervisory personnel to control the game and prevent retaliatory or reckless pitching, and failing to provide adequate equipment to safeguard him from serious head injury. Avila also alleged that the District acted negligently by failing to take reasonable steps to train and supervise its managers, trainers, employees, and agents in providing medical care to injured players and by conducting an illegal preseason game in violation of community college baseball rules designed to protect participants such as Avila.

The District demurred, contending it was protected by Government Code section 831.7, subdivision (a),[2] a public entity tort immunity statute. The District also contended that under *Ochoa v. California State University* (1999) 72 Cal.App.4th 1300 [85 Cal.Rptr.2d 768] (*Ochoa*), it owed no duty of care to Avila. The trial court sustained the demurrer and dismissed the action against the District.

A divided Court of Appeal reversed. Relying on *Acosta v. Los Angeles Unified School Dist.* (1995) 31 Cal.App.4th 471 [37 Cal.Rptr.2d 171] (*Acosta*) and *Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218 [38 Cal.Rptr.2d 35] (*Iverson*), the majority concluded that section 831.7 does not extend immunity to claims predicated on the negligent supervision of public school athletes and that the District owed a duty of supervision to Avila. The dissent argued that *Acosta* and *Iverson* create a limited exception only for secondary school students and that section 831.7 immunity applied.

We granted the District's petition for review to resolve an apparent split in the Courts of Appeal concerning the scope of section 831.7 immunity and to address the extent of a college's duty in these circumstances.

---

[2] All subsequent unlabeled statutory references are to the Government Code.

DISCUSSION

## I. *Section 831.7 Immunity*

■ As always, we begin our analysis of a statute's meaning with its text. (*Elsner v. Uveges* (2005) 34 Cal.4th 915, 927 [22 Cal.Rptr.3d 530, 102 P.3d 915].) Section 831.7 provides: "Neither a public entity nor a public employee is liable to any person who participates in a hazardous recreational activity . . . for any damage or injury to property or persons arising out of that hazardous recreational activity." (*Id.*, subd. (a).) In turn, a "hazardous recreational activity" is defined as "a recreational activity conducted on property of a public entity which creates a substantial (as distinguished from a minor, trivial, or insignificant) risk of injury to a participant or a spectator." (*Id.*, subd. (b).) "Hazardous recreational activity" is further defined by a nonexclusive list of activities that qualify, including such activities as diving, skiing, hang gliding, rock climbing, and body contact sports. (*Ibid.*)

The text is ambiguous. The statute does not specifically define "recreational activity," but instead includes a definition for "hazardous recreational activity." That definition defines and illustrates what is meant by the term "hazardous," while merely reusing the phrase "recreational activity." (§ 831.7, subd. (b).) The term "recreational," however, is susceptible to multiple interpretations. For example, "recreation" may be defined as "Refreshment of one's mind or body *after work* through some activity that amuses or stimulates; *play*." (American Heritage Dict. (2d college ed. 1982) p. 1035, italics added.) Under this definition, not only the nature of the activity but the context matters. Pitching in an adult amateur softball game would qualify as recreational; pitching for the Oakland Athletics or San Francisco Giants professional baseball teams would not. What of playing in a high school or intercollegiate baseball game, which falls somewhere between these extremes? Does it matter if one is a scholarship athlete, and thus receiving some form of reward for one's continued performance, or if one's participation in a sporting activity is compulsory because of state laws governing physical education instruction? The text alone cannot answer these questions.

This ambiguity is reflected in the disparate conclusions the Courts of Appeal have reached when applying the statutory language to negligence claims against schools and universities. For example, in *Acosta, supra*, 31 Cal.App.4th 471, a high school gymnast was practicing at his high school during the off-season under the supervision of an assistant gymnastics coach. He fell during a difficult maneuver, landed on his neck, and was rendered a

quadriplegic. The Court of Appeal ruled that section 831.7 did not immunize the school district from liability for negligent supervision. While the court acknowledged that gymnastics was a hazardous activity, it concluded that school districts have a well-established duty to provide reasonable supervision of school-sponsored extracurricular sports programs. (*Acosta*, at pp. 477–478 [citing *Leger v. Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448, 1459 [249 Cal.Rptr. 688], and numerous additional out-of-state authorities].) The court found no indication the Legislature, when it adopted section 831.7, had intended to abrogate that duty. In order to resolve the conflict between the language of section 831.7 and the line of cases establishing a duty of supervision, the *Acosta* court reasoned that the term "recreational" should be interpreted to exclude supervised school-sponsored extracurricular athletics. (*Acosta*, at pp. 476, 478.)

In *Iverson, supra*, 32 Cal.App.4th 218, an eighth-grade student was injured by a hard tackle during a physical education class soccer game. Here again, the court rejected section 831.7 immunity. Though distinguishing *Acosta* as involving extracurricular activities, *Iverson* agreed with much of its reasoning. It found in the legislative history of the statute no indication the Legislature intended to immunize schools from liability for injuries to students participating in school sports. While recognizing that soccer might be hazardous, *Iverson* agreed with *Acosta* that school sports activities could fairly be excluded from the definition of "recreational." Because Iverson was not injured during participation in a hazardous "recreational" activity, section 831.7 had no application. (*Iverson*, at pp. 225–227.)

In contrast, in *Ochoa, supra*, 72 Cal.App.4th 1300, a California State University, Sacramento (Sacramento State) student was injured in an intramural soccer game. Escalating roughness culminated in one player throwing a punch, catching plaintiff Ochoa in the jaw. Ochoa sued Sacramento State for negligently failing to supervise the game. The trial court granted Sacramento State's motion for summary judgment and the Court of Appeal affirmed, concluding that section 831.7 immunized the university from liability. (*Ochoa*, at p. 1306.) The court distinguished *Acosta* and *Iverson* as not involving adult students engaged in voluntary activities. Because soccer is a hazardous activity and Ochoa was an adult who was neither required nor expected to participate in the match, the court determined Ochoa was injured during a hazardous "recreational" activity within the meaning of section 831.7 and, accordingly, held Sacramento State absolutely immune. (*Ochoa*, at p. 1308.)

In the absence of an unambiguous plain meaning, we must look to extrinsic sources such as legislative history to determine the statute's meaning.

(*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977 [90 Cal.Rptr.2d 260, 987 P.2d 727].) Our review of the legislative history of section 831.7 leads us to agree with *Acosta* and *Iverson*. The statute's roots lie in Civil Code section 846, a premises liability statute that provides qualified immunity for landowners against claims by recreational users: "An owner of any estate or any other interest in real property, whether possessory or nonpossessory, owes no duty of care to keep the premises safe for entry or use by others for any recreational purpose or to give any warning of hazardous conditions, uses of, structures, or activities on such premises to persons entering for such purpose, except as provided in this section." Civil Code section 846 leaves in place whatever common law premises liability would exist "(a) for willful or malicious failure to guard or warn against a dangerous condition, use, structure or activity; or (b) for injury suffered in any case where permission to enter for the above purpose was granted for a consideration other than the consideration, if any, paid to said landowner by the state, or where consideration has been received from others for the same purpose; or (c) to any persons who are expressly invited rather than merely permitted to come upon the premises by the landowner." (Civ. Code, § 846.)

In the late 1970's, a split of authority developed over whether Civil Code section 846 immunity extended to public entities. Early cases assumed it did. (See *English v. Marin Mun. Water Dist.* (1977) 66 Cal.App.3d 725, 728–731 [136 Cal.Rptr. 224]; *Gerkin v. Santa Clara Valley Water Dist.* (1979) 95 Cal.App.3d 1022, 1025–1028 [157 Cal.Rptr. 612]; *Moore v. City of Torrance* (1979) 101 Cal.App.3d 66, 72 [166 Cal.Rptr. 192]; *Blakley v. State of California* (1980) 108 Cal.App.3d 971, 975 [167 Cal.Rptr. 1].) Later cases reversed this trend. (See, e.g., *Nelsen v. City of Gridley* (1980) 113 Cal.App.3d 87, 91 [169 Cal.Rptr. 757].) This court finally resolved the issue in 1983, siding with the later cases and holding that public entities are not protected by Civil Code section 846. (*Delta Farms Reclamation Dist. v. Superior Court* (1983) 33 Cal.3d 699, 710 [190 Cal.Rptr. 494, 660 P.2d 1168].)

While *Delta Farms Reclamation Dist. v. Superior Court, supra,* 33 Cal.3d 699, was still pending in this court, Assemblyman Robert Campbell responded to the uncertainty by introducing Assembly Bill No. 555 (1983–1984 Reg. Sess.), which proposed new Government Code section 831.7. The bill's source, the East Bay Regional Park District, had expressed concern that because it was virtually impossible to prevent park users from engaging in hazardous recreational activities, substantial legal claims from recreational users might force it to limit park access. Other supporters decried allegedly baseless personal injury and property damage suits by recreational public property users. (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 555

(1983–1984 Reg. Sess.) as introduced Feb. 10, 1983, p. 2; Richard C. Trudeau, Gen. Manager, East Bay Regional Park Dist., letter to Sen. Com. on Judiciary, May 26, 1983; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 555 (1983–1984 Reg. Sess.) as amended May 31, 1983, p. 7.) The Assembly Committee on the Judiciary analysis of the bill noted the uncertainty in the Courts of Appeal over the availability of Civil Code section 846 qualified immunity to public entities. (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 555 (1983–1984 Reg. Sess.) as introduced Feb. 10, 1983, pp. 2–3.) It explained that Civil Code section 846's "qualified immunity is [intended] to encourage landowners to make their land available to the general public for recreational purposes without risk of tort liability for permitting that use" and that "[t]his bill is patterned after Civil Code [s]ection 846." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 555 (1983–1984 Reg. Sess.) as introduced Feb. 10, 1983, pp. 2, 3; see also Sen. Com. on Judiciary, Analysis of Assem. Bill No. 555 (1983–1984 Reg. Sess.) as amended May 27, 1983, p. 4 ["This bill is patterned after existing law which generally provides that a private owner of any interest in land owes no duty to keep the premises safe or to warn of dangerous conditions when people are permitted to use the land for recreation"].)

The Senate Committee on the Judiciary's analysis confirms that Government Code section 831.7 was designed to mirror Civil Code section 846's circumscription of property-based duties. Assembly Bill No. 555, "by providing a qualified immunity, would limit a public entity's *duty to keep its land safe* for certain recreational users." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 555 (1983–1984 Reg. Sess.) as amended May 31, 1983, p. 7, italics added.) The bill's focus, the analysis explained, was on recreational users who might injure themselves during hazardous unsupervised activities and attempt to attribute their injuries to conditions of public property. "The primary purpose of [Assembly Bill No. 555] is to prevent the hang glider or rock climber from suing a public entity when that person injured himself in the course of the activity." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 555 (1983–1984 Reg. Sess.) as amended May 27, 1983, p. 6.)

Thus, Government Code section 831.7 was adopted as a premises liability measure, modeled on Civil Code section 846, and designed to limit liability based on a public entity's failure either to maintain public property or to warn of dangerous conditions on public property. Nothing in the history of the measure indicates the statute was intended to limit a public entity's liability arising from other duties, such as any duty owed to supervise participation in

particular activities. Consistent with the legislative history, those cases applying section 831.7 immunity generally have done so only in the context of injuries sustained during voluntary, unsupervised, unsponsored activities and have barred claims alleging breach of the duty to maintain property or to warn of unsafe conditions. (E.g., *Wood v. County of San Joaquin* (2003) 111 Cal.App.4th 960 [4 Cal.Rptr.3d 340] [§ 831.7 barred claim for injury sustained during unsupervised, unsponsored boating]; *Yarber v. Oakland Unified School Dist.* (1992) 4 Cal.App.4th 1516 [6 Cal.Rptr.2d 437] [same for injury sustained during after-hours adult basketball game]; *Tessier v. City of Newport Beach* (1990) 219 Cal.App.3d 310 [268 Cal.Rptr. 233] [same for injury sustained during unsupervised diving].)

■ Separate and apart from the body of law governing premises liability claims, another body of law establishes that public schools and universities owe certain non-property-based duties to their students. Public schools have a duty to supervise students (Ed. Code, § 44807; *Hoyem v. Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 513 [150 Cal.Rptr. 1, 585 P.2d 851]; *Dailey v. Los Angeles Unified School Dist.* (1970) 2 Cal.3d 741, 747 [87 Cal.Rptr. 376, 470 P.2d 360]), a duty that extends to athletic practice and play (see *Leger v. Stockton Unified School Dist., supra,* 202 Cal.App.3d at pp. 1458–1459). Although with the demise of the in loco parentis doctrine, colleges and universities do not owe similarly broad duties of supervision to all their students (*Stockinger v. Feather River Community College* (2003) 111 Cal.App.4th 1014, 1031–1032 [4 Cal.Rptr.3d 385]; *Crow v. State of California* (1990) 222 Cal.App.3d 192, 209 [271 Cal.Rptr. 349]; *Baldwin v. Zoradi* (1981) 123 Cal.App.3d 275, 287–291 [176 Cal.Rptr. 809]), that development has not limited the recognition that colleges and universities owe special duties to their athletes when conducting athletic practices and games.[3]

As *Acosta, supra,* 31 Cal.App.4th 471, correctly notes, a tension exists between the immunity language of section 831.7, on the one hand, and the long-standing statutory and common law duties of student supervision schools

---

[3] *Fortier v. Los Rios Community College Dist.* (1996) 45 Cal.App.4th 430, 435–436 [52 Cal.Rptr.2d 812] (college instructor has duty not to increase risks inherent in participation in sport); *Kleinknecht v. Gettysburg College* (3d Cir. 1993) 989 F.2d 1360, 1372 (college owes duty to student-athlete to have timely medical care available); *Stineman v. Fontbonne College* (8th Cir. 1981) 664 F.2d 1082, 1086 (same); *Davidson v. Univ. of N.C. at Chapel Hill* (2001) 142 N.C. App. 544 [543 S.E.2d 920, 926–928] (university owes duty of care to members of school-sponsored intercollegiate team); see also Comment, *Malpractice During Practice: Should NCAA Coaches Be Liable for Negligence?* (2002) 22 Loyola L.A. Ent. L.Rev. 613, 625–635; Comment, *Do Universities Have a Special Duty of Care to Protect Student-Athletes from Injury?* (1999) 6 Vill. Sports & Ent. L.J. 219, 224–229; Comment, *The Special Relationship Between Student-Athletes and Colleges: An Analysis of a Heightened Duty of Care for the Injuries of Student-Athletes* (1996) 7 Marq. Sports L.J. 329, 338–342; Whang, *Necessary Roughness: Imposing a Heightened Duty of Care on Colleges for Injuries of Student-Athletes* (1995) 2 Sports Law. J. 25, 39–44 (hereafter Whang).

have been recognized to have both before and after passage of section 831.7. Tension likewise exists between the legislative history of the statute, which establishes an intent focused exclusively on premises liability claims, and the language the Legislature chose to effectuate its purpose, which conceivably could be applied to a broader range of claims. (*Acosta*, at p. 476.) But, as in *Acosta*, we need not decide whether the immunity created by section 831.7 extends only to premises liability claims. We agree with *Acosta* and *Iverson*, *supra*, 32 Cal.App.4th 218, that these tensions can be resolved by acknowledging that school-sponsored and supervised sports activities are not "recreational" in the sense intended by the statute, and thus section 831.7 does not apply to immunize public educational entities from liability to students for injuries sustained during participation in such activities.

As noted, the legislative history demonstrates the Legislature had in mind immunizing public entities from liability arising from injuries sustained by members of the public during voluntary unsupervised play on public land, in order to prevent public entities from having to close off their land to such use to limit liability. Such activities may be fairly characterized as recreational. Sports in the school environment, in contrast, are not "recreational" in the sense of voluntary unsupervised play, but rather part and parcel of the school's educational mission. "It can no longer be denied that extracurricular activities constitute an integral component of public education." (*Hartzell v. Connell* (1984) 35 Cal.3d 899, 909 [201 Cal.Rptr. 601, 679 P.2d 35].) "They are '[no] less fitted for the ultimate purpose of our public schools, to wit, the making of good citizens *physically*, mentally, and morally, than the study of algebra and Latin . . . .' " (*Ibid.*, italics added.) Interscholastic athletics are a fundamental, integral part of public education.[4] Through high school, participation in physical education classes is mandatory. (Ed. Code, §§ 51210, subd. (g), 51220, subd. (d), 51222; see also *id.*, § 51210.2, subd. (a) [declaring physical fitness of equal importance with other elements of curriculum].) Likewise, "[c]ollege athletic programs have long been regarded as integral components of the college experience." (Whang, *supra*, 2 Sports Law. J. at p. 25; see *California State University, Hayward v. National Collegiate Athletic Assn.* (1975) 47 Cal.App.3d 533, 541–542 [121 Cal.Rptr. 85].) Intercollegiate athletics are part and parcel of community colleges' educational mission as well. (*Cabrillo Community College Dist. v. California Junior College Assn.* (1975) 44 Cal.App.3d 367, 372–373 [118 Cal.Rptr. 708].) And, as discussed above, a separate body of law has developed to govern the special duties that schools and colleges owe their athletes.

---

[4] See *Brentwood Academy v. Tennessee Secondary School Athletic Assn.* (2001) 531 U.S. 288, 299 [148 L.Ed.2d 807, 121 S.Ct. 924]; *City of Santa Cruz v. Santa Cruz City Schools Bd. of Ed.* (1989) 210 Cal.App.3d 1, 8–9 [258 Cal.Rptr. 101]; *Kelley v. Metropolitan County Bd. of Ed. of Nashville, Etc.* (M.D.Tenn. 1968) 293 F.Supp. 485, 493; *Lee v. Macon County Board of Education* (M.D.Ala. 1968) 283 F.Supp. 194, 197.

■ The paramount goal of statutory interpretation is to "ascertain the intent of the drafters so as to effectuate the purpose of the law." (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 268 [121 Cal.Rptr.2d 203, 47 P.3d 1069].) Nothing in the legislative history indicates the Legislature ever contemplated or intended that passage of section 831.7 would overrule the body of law governing supervisorial duties and liability in the school sports context. We agree with the Court of Appeal in *Acosta, supra,* 31 Cal.App.4th at page 478: In the absence of any indication of such a legislative intent, we will not read section 831.7 as immunizing public entities from potential liability arising out of their oversight of school-sponsored activities.

■ Thus, we conclude that school sports in general, and organized intercollegiate games in particular, are not "recreational" within the meaning of the statute.[5] Avila was injured while participating in an intercollegiate baseball game. Section 831.7 does not immunize the District from liability.

## II. *The Duty of Care Owed College Athletes*

### A. *Primary Assumption of the Risk and the Duty Not to Increase Risks Inherent in a Sport*

■ The District asserted as an alternate basis for demurrer that it owed Avila no duty of care. To recover for negligence, Avila must demonstrate, inter alia, that the District breached a duty of care it owed him. Generally, each person has a duty to exercise reasonable care in the circumstances and is liable to those injured by the failure to do so. (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561].) By statute, the Legislature has extended this common law standard of tort liability to public employees (§ 820, subd. (a); *Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 932 [80 Cal.Rptr.2d 811, 968 P.2d 522]) and has extended liability for public employees' negligent acts to public entity defendants (§ 815.2, subd. (a); *Hoff,* at p. 932).

■ The existence of " ' "[d]uty" is not an immutable fact of nature " 'but only an expression of the sum total of those *considerations of policy* which lead the law to say that the particular plaintiff is entitled to protection.' " ' "

---

[5] Taking the allegations of the complaint as true, it is clear Avila's injury occurred during a school-sponsored intercollegiate game that was supervised in part by Citrus College coaches. We need not define further the degree of school sponsorship necessary to render participation in a hazardous sport "nonrecreational." Consequently, we have no occasion to question the conclusion that injuries sustained in unsupervised intramural or club matches may fall within the scope of section 831.7. (See *Ochoa, supra,* 72 Cal.App.4th at pp. 1307–1308 [holding injury from voluntary participation in intramural match subject to § 831.7 immunity].) However, to the extent *Ochoa v. California State University, supra,* 72 Cal.App.4th 1300, 1308, suggests section 831.7 *always* immunizes universities against liability for injuries sustained by their adult student-athletes, we disapprove it.

(*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472 [63 Cal.Rptr.2d 291, 936 P.2d 70].) Thus, the existence and scope of a defendant's duty is an issue of law, to be decided by a court not a jury. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1004 [4 Cal.Rptr.3d 103, 75 P.3d 30].) When the injury is to a sporting participant, the considerations of policy and the question of duty necessarily become intertwined with the question of assumption of risk.

The traditional version of the assumption of risk doctrine required proof that the plaintiff voluntarily accepted a specific known and appreciated risk. (*Prescott v. Ralph's Grocery Co.* (1954) 42 Cal.2d 158, 161–162 [265 P.2d 904], citing Rest., Torts, § 893.) The doctrine depended on the actual subjective knowledge of the given plaintiff (*Shahinian v. McCormick* (1963) 59 Cal.2d 554, 567 [30 Cal.Rptr. 521, 381 P.2d 377]) and, where the elements were met, was an absolute defense to liability for injuries arising from the known risk (*Quinn v. Recreation Park Assn.* (1935) 3 Cal.2d 725, 731 [46 P.2d 144]).

■ California's abandonment of the doctrine of contributory negligence in favor of comparative negligence (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226]) led to a reconceptualization of the assumption of risk. In *Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*), a plurality of this court explained that there are in fact two species of assumption of risk: primary and secondary. (*Id.* at pp. 308–309 (plur. opn. of George, J.).) Primary assumption of the risk arises when, as a matter of law and policy, a defendant owes no duty to protect a plaintiff from particular harms. (*Ibid.*)[6] Applied in the sporting context, it precludes liability for injuries arising from those risks deemed inherent in a sport; as a matter of law, others have no legal duty to eliminate those risks or otherwise protect a sports participant from them. (*Id.* at pp. 315–316.) Under this duty approach, a court need not ask what risks a particular plaintiff subjectively knew of and chose to encounter, but instead must evaluate the fundamental nature of the sport and the defendant's role in or relationship to that sport in order to determine whether the defendant owes a duty to protect a plaintiff from the particular risk of harm. (*Id.* at pp. 313, 315–317.) A majority of this court has since embraced the *Knight* approach. (*Kahn v. East Side Union High School Dist., supra,* 31 Cal.4th at pp. 1004–1005; *Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1067–1068 [68 Cal.Rptr.2d 859, 946 P.2d 817].)

■ Here, the host school's role is a mixed one: its players are coparticipants, its coaches and managers have supervisorial authority over the conduct

---

[6] Secondary assumption of the risk arises when the defendant still owes a duty of care, but the plaintiff knowingly encounters the risks attendant on the defendant's breach of that duty. (*Knight, supra,* 3 Cal.4th at p. 308.) We deal here with an issue of primary, not secondary, assumption of the risk.

of the game, and other representatives of the school are responsible for the condition of the playing facility. We have previously established that coparticipants have a duty not to act recklessly, outside the bounds of the sport (*Knight, supra*, 3 Cal.4th at pp. 318–321), and coaches and instructors have a duty not to increase the risks inherent in sports participation (*Kahn v. East Side Union High School Dist., supra*, 31 Cal.4th at pp. 1005–1006); we also have noted in dicta that those responsible for maintaining athletic facilities have a similar duty not to increase the inherent risks, albeit in the context of businesses selling recreational opportunities (*Parsons v. Crown Disposal Co., supra*, 15 Cal.4th at p. 482 [collecting cases]). In contrast, those with no relation to the sport have no such duty. (*Id.* at pp. 482–483 [garbage truck operator has no duty not to increase risks inherent in horseback riding].)

In interscholastic and intercollegiate competition, the host school is not a disinterested, uninvolved party vis-à-vis the athletes it invites to compete on its grounds. Without a visiting team, there can be no competition. Intercollegiate competition allows a school to, on the smallest scale, offer its students the benefits of athletic participation and, on the largest scale, reap the economic and marketing benefits that derive from maintenance of a major sports program.[7] These benefits justify removing a host school from the broad class of those with no connection to a sporting contest and no duty to the participants. In light of those benefits, we hold that in interscholastic and intercollegiate competition, the host school and its agents owe a duty to home and visiting players alike to, at a minimum, not increase the risks inherent in the sport. Schools and universities are already vicariously liable for breaches by the coaches they employ, who owe a duty to their own athletes not to increase the risks of sports participation. (*Kahn v. East Side Union High School Dist., supra*, 31 Cal.4th at pp. 1005–1006.) No reason appears to conclude intercollegiate athletics will be harmed by making visiting players, necessary coparticipants in any game, additional beneficiaries of the limited duty not to increase the risks of participation. Thus, we disagree with the Court of Appeal dissent, which argued that the District is little more than a passive provider of facilities and therefore should have no obligation to visiting players.

The District relies on cases establishing that colleges and universities owe no general duty to their students to ensure their welfare. (*Crow v. State of California, supra*, 222 Cal.App.3d at p. 209; *Baldwin v. Zoradi, supra*, 123 Cal.App.3d at pp. 287–291.) We have no quarrel with these cases. Nor do we

---

[7] These benefits may include enhanced recruitment of athletes and other students, increased alumni donations, and revenue from the sale of broadcasting rights. (See Note, *Taking One for the Team: Davidson v. University of North Carolina and the Duty of Care Owed by Universities to Their Student-Athletes* (2002) 37 Wake Forest L.Rev. 589, 589–590, 605–606; Whang, *supra*, 2 Sports Law. J. at pp. 26–27, 40–42.)

have occasion to decide what duties a college or university might owe in the context of *intra*collegiate competition, as with the intramural competition at issue in *Ochoa, supra*, 72 Cal.App.4th 1300, also relied upon by the District. The duty of a host school to its own and visiting players in school-supervised athletic events is an exception to the general absence of duty, an exception plainly warranted by the relationship of the host school to all the student participants in the competitions it sponsors.

### B. *Application*

We consider next whether Avila has alleged facts supporting breach of the duty not to enhance the inherent risks of his sport. Though it numbers them differently, Avila's complaint in essence alleges four ways in which the District breached a duty to Avila by: (1) conducting the game at all; (2) failing to control the Citrus College pitcher; (3) failing to provide umpires to supervise and control the game; and (4) failing to provide medical care.[8] The District's demurrer was properly sustained if, and only if, each of these alleged breaches, assumed to be true, falls outside any duty owed by the District and within the inherent risks of the sport assumed by Avila.

With respect to the first of these, conducting the game, Avila cites unspecified "community college baseball rules" prohibiting preseason games. But the only consequence of the District's hosting the game was that it exposed Avila, who chose to participate, to the ordinary inherent risks of the sport of baseball. Nothing about the bare fact of the District's hosting the game enhanced those ordinary risks, so its doing so, whether or not in violation of the alleged rules, does not constitute a breach of its duty not to enhance the ordinary risks of baseball. Nor did the District owe any separate duty to Avila not to host the game.

The second alleged breach, the failure to supervise and control the Citrus College pitcher, is barred by primary assumption of the risk. Being hit by a pitch is an inherent risk of baseball. (*Balthazor v. Little League Baseball, Inc.* (1998) 62 Cal.App.4th 47, 51–52 [72 Cal.Rptr.2d 337]; see also *Mann v. Nutrilite, Inc.* (1955) 136 Cal.App.2d 729, 734 [289 P.2d 282] [same regarding being hit by thrown ball].) The dangers of being hit by a pitch, often thrown at

---

[8] Avila abandoned at oral argument a fifth theory, that the District breached a duty to him by providing faulty equipment, counsel stating he had learned through discovery that the District had not furnished the allegedly defective batting helmet. We take a dim view of counsel's decision to wait until oral argument to apprise this court that a claim is being abandoned. When counsel learns of new facts that cause him to abandon a claim, the proper course is *promptly* to advise opposing counsel and the court.

speeds approaching 100 miles per hour, are apparent and well known: being hit can result in serious injury or, on rare tragic occasions, death.[9]

Being *intentionally* hit is likewise an inherent risk of the sport, so accepted by custom that a pitch intentionally thrown at a batter has its own terminology: "brushback," "beanball," "chin music." In turn, those pitchers notorious for throwing at hitters are "headhunters." Pitchers intentionally throw at batters to disrupt a batter's timing or back him away from home plate, to retaliate after a teammate has been hit, or to punish a batter for having hit a home run. (See, e.g., Kahn, The Head Game (2000) pp. 205–239.) Some of the most respected baseball managers and pitchers have openly discussed the fundamental place throwing at batters has in their sport. In George Will's study of the game, Men at Work, one-time Oakland Athletics and current St. Louis Cardinals manager Tony La Russa details the strategic importance of ordering selective intentional throwing at opposing batters, principally to retaliate for one's own players being hit. (Will, Men at Work (1990) pp. 61–64.) As Los Angeles Dodgers Hall of Fame pitcher Don Drysdale and New York Giants All Star pitcher Sal "The Barber" Maglie have explained, intentionally throwing at batters can also be an integral part of pitching tactics, a tool to help get batters out by upsetting their frame of mind.[10] Drysdale and Maglie are not alone; past and future Hall of Famers, from Early Wynn and Bob Gibson to Pedro Martinez and Roger Clemens, have relied on the actual or threatened willingness to throw at batters to aid their pitching. (See, e.g., Kahn, The Head Game, at pp. 223–224; *Yankees Aced by Red Sox*, L.A. Times (May 31, 2001) p. D7 [relating Martinez's assertion that he would even throw at Babe Ruth].)

While these examples relate principally to professional baseball, "[t]here is nothing legally significant . . . about the level of play" in this case. (*West v. Sundown Little League of Stockton, Inc.* (2002) 96 Cal.App.4th 351, 359–360 [116 Cal.Rptr.2d 849]; see *Balthazor v. Little League Baseball, Inc., supra*, 62 Cal.App.4th at pp. 51–52; *Mann v. Nutrilite, Inc., supra*, 136 Cal.App.2d at p. 734.) The laws of physics that make a thrown baseball dangerous and the

---

[9] Most famously, in August 1920, Cleveland Indians shortstop Roy Chapman was hit by a pitch from the New York Yankees' Carl Mays. He died the next day. (Sowell, The Pitch that Killed (1989) pp. 165–190; James, The Bill James Baseball Abstract (1985) pp. 131, 137.) At least seven other batters in organized baseball have been killed by pitches. (James, at pp. 131, 137.)

[10] Kahn, The Head Game, *supra*, at pages 211–212, 232–235. As Maglie explained the strategy: " 'You have to make the batter afraid of the ball or, anyway, aware that he can get hurt . . . . A good time is when the count is two [balls] and two [strikes]. He's looking to swing. You knock him down then and he gets up shaking. Now [throw a] curve [to] him and you have your out.' " (*Id.* at p. 211.) Maglie's nickname is attributed to his propensity for shaving batters' chins with his pitches. (*Ibid.*) Similarly for Drysdale: " '[T]he knockdown pitch upsets a hitter's timing, like a change-up. It's not a weapon. It's a tactic.' " (*Id.* at p. 235.)

strategic benefits that arise from disrupting a batter's timing are only minimally dependent on the skill level of the participants, and we see no reason to distinguish between collegiate and professional baseball in applying primary assumption of the risk.

It is true that intentionally throwing at a batter is forbidden by the rules of baseball. (See, e.g., Off. Rules of Major League Baseball, rule 8.02(d); Nat. Collegiate Athletic Assn., 2006 NCAA Baseball Rules (Dec. 2005) rule 5, § 16(d), p. 62.) But "even when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule." (*Knight, supra,* 3 Cal.4th at pp. 318–319.) It is one thing for an umpire to punish a pitcher who hits a batter by ejecting him from the game, or for a league to suspend the pitcher; it is quite another for tort law to chill any pitcher from throwing inside, i.e., close to the batter's body—a permissible and essential part of the sport—for fear of a suit over an errant pitch. For better or worse, being intentionally thrown at is a fundamental part and inherent risk of the sport of baseball.[11] It is not the function of tort law to police such conduct.

In *Knight, supra,* 3 Cal.4th at page 320, we acknowledged that an athlete does not assume the risk of a coparticipant's intentional or reckless conduct "totally outside the range of the ordinary activity involved in the sport." Here, even if the Citrus College pitcher intentionally threw at Avila, his conduct did not fall outside the range of ordinary activity involved in the sport. The District owed no duty to Avila to prevent the Citrus College pitcher from hitting batters, even intentionally. Consequently, the doctrine of primary assumption of the risk bars any claim predicated on the allegation that the Citrus College pitcher negligently or intentionally threw at Avila.[12]

---

[11] The conclusion that being intentionally hit by a pitch is an inherent risk of baseball extends only to situations such as that alleged here, where the hit batter is at the plate. Allegations that a pitcher intentionally hit a batter who was still in the on deck circle, or elsewhere, would present an entirely different scenario. (See Note, *Dollar Signs on the Muscle . . . and the Ligament, Tendon, and Ulnar Nerve: Institutional Liability Arising from Injuries to Student-Athletes* (2001) 3 Va. J. Sports & L. 80, 80, 111–112 [recounting the notorious 1999 incident in which Wichita State University pitcher Ben Christensen hit University of Evansville second baseman Anthony Molina with a pitch while Molina was still in the on deck circle].)

[12] The dissent takes issue with our deciding this question. (Conc. & dis. opn., *post,* at pp. 171–173.) Notwithstanding the official condemnation we and the dissent cite, pitchers have been throwing at batters for the better part of baseball's century-plus history. The taking of judicial notice of such matters is not reserved to trial courts, but lies within the power of every court. (Evid. Code, § 459.) To ignore this history in favor of reversal and remand would do

■ The dissent suggests primary assumption of the risk should not extend to an intentional tort such as battery and that Avila should have been granted leave to amend to allege a proper battery claim. (Conc. & dis. opn. *post*, at pp. 171, 173.) Amendment would have been futile. Absence of consent is an element of battery. (*Barouh v. Haberman* (1994) 26 Cal.App.4th 40, 45–46 [31 Cal.Rptr.2d 259].) "One who enters into a sport, game or contest may be taken to consent to physical contacts consistent with the understood rules of the game." (Prosser & Keeton, Torts (5th ed. 1984) § 18, p. 114; see also *Knight, supra*, 3 Cal.4th at p. 311 ["It may be accurate to suggest that an individual who voluntarily engages in a potentially dangerous activity or sport 'consents to' or 'agrees to assume' the risks inherent in the activity"]; *Ritchie-Gamester v. City of Berkley* (Mich. 1999) 461 Mich. 73 [597 N.W.2d 517, 523] ["The act of stepping onto the field may be described as 'consent to the inherent risks of the activity' "].) Thus, the boxer who steps into the ring consents to his opponent's jabs; the football player who steps onto the gridiron consents to his opponent's hard tackle; the hockey goalie who takes the ice consents to face his opponent's slapshots; and, here, the baseball player who steps to the plate consents to the possibility the opposing pitcher may throw near or at him. The complaint establishes Avila voluntarily participated in the baseball game; as such, his consent would bar any battery claim as a matter of law.

The third way in which Avila alleges the District breached its duty of care, by failing to provide umpires, likewise did not increase the risks inherent in the game. Baseball may be played with umpires, as between professionals at the World Series, or without, as between children in the sandlot. Avila argues that providing umpires would have made the game safer, because an umpire might have issued a warning and threatened ejections after the first batter was hit. Whatever the likelihood of this happening and the difficulty of showing causation, the argument overlooks a key point. The District owed "a duty not to increase the risks inherent in the sport, not a duty to decrease the risks." (*Balthazor v. Little League Baseball, Inc., supra*, 62 Cal.App.4th at p. 52; accord, *West v. Sundown Little League of Stockton, Inc., supra*, 96 Cal.App.4th at p. 359.) While the provision of umpires might—*might*—have reduced the risk of a retaliatory beanball, Avila has alleged no facts supporting imposition of a duty on the District to reduce that risk.

Finally, Avila alleges that the District breached a duty to him by failing to provide medical care after he was injured. Relying on *Brooks v. E. J. Willig Truck Transp. Co.* (1953) 40 Cal.2d 669 [255 P.2d 802] (*Brooks*), he argues

nothing to enhance respect for the trial and appellate courts' respective roles. Similarly, a declaration of the scope of a defendant's duty is a statement of law. (*Kahn v. East Side Union High School Dist., supra*, 31 Cal.4th at p. 1004.) Where, as here, the pleadings and matters subject to judicial notice establish the defendant owed the plaintiff no duty, a case may properly be disposed of on demurrer, without further waste of judicial resources.

that because the District placed him in peril through the actions of the Citrus College pitcher, it had a duty to ensure he received medical attention.

In some circumstances, the common law imposes a duty on those who injure others to mitigate the resulting harm. Under the Restatement Second of Torts, section 322, an actor who "knows or has reason to know that by his conduct, whether tortious or innocent, he has caused such bodily harm to another as to make him helpless and in danger of further harm . . . is under a duty to exercise reasonable care to prevent such further harm." (Boldface omitted.) In *Brooks*, we recognized and applied this principle, holding in the context of a hit-and-run death that "[o]ne who negligently injures another and renders him helpless is bound to use reasonable care to prevent any further harm which the actor realizes or should realize threatens the injured person." (*Brooks*, *supra*, 40 Cal.2d at pp. 678–679.)

Avila's proposed extension of *Brooks* to this case encounters at least three main difficulties. First, Avila has not alleged a basis on which to conclude the District caused his injury. Universities ordinarily are not vicariously liable for the actions of their student-athletes during competition. (*Townsend v. State of California* (1987) 191 Cal.App.3d 1530, 1536–1537 [237 Cal.Rptr. 146] [university not vicariously liable for actions of its basketball player]; see also *Fox v. Bd. of Sup'rs of La. State Univ.* (La. 1991) 576 So.2d 978, 982–983 [no vicarious liability for actions of rugby club]; *Kavanagh v. Trustees of Boston University* (2003) 440 Mass. 195 [795 N.E.2d 1170, 1174–1176] [no vicarious liability for actions of basketball player]; *Hanson v. Kynast* (1986) 24 Ohio St. 3d 171 [24 Ohio B. 403, 494 N.E.2d 1091, 1096] [no vicarious liability for actions of lacrosse player].) While Avila argues the District should be responsible for the Citrus College pitcher's conduct if the Citrus College coaches ordered or condoned a retaliatory pitch, the complaint notably lacks any allegation they did so.

Second, even if Avila might have amended his complaint to add such an allegation, *Brooks* and the common law duty it recognizes are confined to situations where the injured party is helpless. The complaint establishes that Avila was able to make it to first and then second base under his own power, and was able to alert his own first base coach to his condition. These allegations cast serious doubt on whether Avila was sufficiently helpless so as to warrant imposing a *Brooks*/Restatement Second of Torts, section 322-type duty on the District.

Third, even if we were to impose a duty, the face of the complaint establishes that Avila's own Rio Hondo coaches and trainers were present. They, not Citrus College's coaches, had exclusive authority to determine whether Avila needed to be removed from the game for a pinch runner in

order to receive medical attention.[13] Likewise, to the extent Avila argues a Citrus-College-provided umpire could have insisted Avila receive medical treatment, there is no basis for concluding a home team umpire would have been authorized to overrule the medical judgments of Rio Hondo's trainers. Thus, even if the District were responsible for causing Avila's injury, at most it would have had a duty to ensure that Avila's coaches and trainers were aware he had been injured so they could decide how best to attend to him. The complaint indicates Avila alerted his own first base coach to how he was feeling, and when he arrived at second base, a Citrus College player, recognizing Avila was injured, alerted the Rio Hondo bench, at which point Rio Hondo removed Avila from the game. If the District had a duty, it satisfied that duty. In the possibly apocryphal words of New York Yankees catcher Yogi Berra, "It ain't over till it's over," but this means that for Avila's complaint against Citrus College, it's over.

### DISPOSITION

For the foregoing reasons, we reverse the judgment of the Court of Appeal.

George, C. J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I concur in part I of the majority opinion. There, the majority correctly holds that the statutory immunity conferred on public entities for an injury occurring during a "hazardous recreational activity" (Gov. Code, § 831.7) does not apply to injuries in intercollegiate baseball games.

I do not, however, join part II of the majority opinion. There, the majority holds that a baseball pitcher owes no duty to refrain from intentionally throwing a baseball at an opposing player's head. This is a startling conclusion. It is contrary to the official view in the sport that such conduct "should be—and is—condemned by everybody." (Off. Rules of Major League Baseball, rule 8.02(d), off. coms.)

Central to the majority's holding is its reliance on the legal rule that there is no duty to avoid risks "inherent" in a recreational sport.[1] This rule had its inception in this court's plurality opinion in *Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696], and it was later embraced by a majority of this court in *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990 [4 Cal.Rptr.3d 103, 75 P.3d 30]. Unlike good wine, this rule has not

---

[13] Any departure from this rule would lead to chaos, as teams asserted a legal duty to remove their opponents' "injured" star players from competition in order to evaluate them and provide any necessary medical care.

[1] In this opinion, I frequently refer to that rule as the no-duty-for-sports rule.

improved with age. I have repeatedly voiced my disagreement with this court's adoption of that rule, which is "tearing at the fabric of tort law" (*Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1075 [68 Cal.Rptr.2d 859, 946 P.2d 817] (conc. opn. of Kennard, J.); see also *Kahn v. East Side Union High School Dist., supra*, 31 Cal.4th at pp. 1021–1022 (conc. & dis. opn. of Kennard, J.)), because it "distort[s] the negligence concept of due care to encompass reckless and intentional conduct." (*Cheong, supra*, at p. 1075 (conc. opn. of Kennard, J.).) Moreover, because the question of what is "inherent" in a sport is amorphous and fact-intensive, it is impossible for trial courts "to discern, at an early stage in the proceedings, which risks are inherent in a given sport." (*Knight v. Jewett, supra*, 3 Cal.4th at p. 337 (dis. opn. of Kennard, J.).) As explained below, this case illustrates that the no-duty-for-sports rule is unworkable and unfair.[2]

## I

Citrus Community College hosted a team from Rio Hondo Community College to compete in a baseball game. (Both schools are located in Southern California.) Because this was a preseason practice game, there was no umpire. Shortly after the Rio Hondo pitcher hit a Citrus player with a pitched ball, the Citrus pitcher, allegedly in retaliation, hit Rio Hondo player Jose Luis Avila in the head with a pitch. Avila suffered unspecified injuries.

Avila sued the Citrus Community College District (the District) and other parties not relevant here, alleging causes of action for general negligence, premises liability, products liability, and intentional tort. As pertinent here, Avila asserted the District was liable for (1) conducting an illegal preseason game in violation of community college rules, (2) failing to supervise and control the Citrus pitcher, (3) failing to provide umpires or other supervisory personnel to prevent reckless and retaliatory pitching, and (4) failing to summon medical care after Avila was hurt.[3]

---

[2] Similar criticisms have appeared in scholarly journals. (See, e.g., Comment, *Looking Beyond the Name of the Game: A Framework for Analyzing Recreational Sports Injury Cases* (2001) 34 U.C. Davis L.Rev. 1029, 1057 ["The *Knight* decision sets an unreasonable standard of care for recreational sports injury cases that violates public policy."]; *Fore! American Golf Corporation v. Superior Court: The Continued Uneven Application of California's Flawed Doctrine of Assumption of Risk* (2001) 29 Western St. U. L.Rev. 125, 145–146 ["*Knight's* vague guidelines regarding duty analysis" are "a flawed conceptualization of the doctrine of assumption of risk" that have "produced uneven results."]; Sugarman, *Judges as Tort Law Un-Makers: Recent California Experience with "New" Torts* (1999) 49 DePaul L.Rev. 455, 485 [expressing "disagreement with the policy judgment that recreational injuries are an appropriate place for such a 'no duty' rule."].)

[3] Avila's complaint actually listed eight separate allegations, but the majority has consolidated and renumbered the allegations. (Maj. opn., *ante*, at p. 163.) For the sake of clarity, I have adopted the majority's numbering system.

The District demurred. Curiously, it made no mention of the no-duty-for-sports rule. Rather, the District asserted that it was not liable under Government Code section 831.7, which immunizes public entities from liability for an injury occurring during a "hazardous recreational activity," and that plaintiff Avila could not assert a claim for premises liability because he had not alleged that the conditions of the baseball field played any role in the injury. The trial court sustained the District's demurrer without granting Avila leave to amend his initial complaint, but the Court of·Appeal reversed. This court granted the District's petition for review.

## II

The first, third, and fourth of the legal theories alleged in Avila's complaint can be disposed of without resort to the no-duty-for-sports rule.

Avila's first theory of liability (that the District conducted an illegal preseason game) fails because, as the majority explains, the District did not breach any duty to Avila by conducting the game, irrespective of whether community college rules permitted it to be played. Avila's third theory (that the District failed to provide umpires) must be rejected because baseball games are often played without umpires, and there is no reason to impose on community colleges a duty to provide them. (See generally *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561].) And Avila's fourth theory (that the District failed to provide medical care) fails because, as the majority points out, the District had no duty to provide medical care when Avila's team came equipped with its own trainers, who were present to treat his injuries.

Avila's second theory of liability (that the District failed to supervise and control the Citrus pitcher) presents a more difficult question. As the majority notes, colleges "ordinarily are not vicariously liable for the actions of their student-athletes during competition." (Maj. opn., *ante*, at p. 167.) Although Avila now argues that the District would be liable if its coaches ordered or allowed a retaliatory pitch aimed at Avila's head, his complaint does not expressly allege that they did so. Thus, his failure to do so justifies the trial court's decision to sustain the District's demurrer. But the trial court should have given Avila at least one opportunity to amend his original complaint to include such an allegation. (See generally 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 944, p. 402 ["An amendment should be allowed where the defect, though one of *substance*, may possibly be cured by supplying omitted allegations, and the plaintiff has not had a fair opportunity to do so, as where the demurrer was sustained to his first complaint."].)

The majority, however, upholds the trial court's sustaining of the District's demurrer *without* leave to amend. Relying on the no-duty-for-sports rule, the majority, in essence, concludes that even if the District's coaches had ordered the Citrus pitcher to hit Avila in the head with a pitched ball, the District is not liable for Avila's injuries because the risk that a batter will be injured by a pitch intentionally thrown at his head is "an inherent risk of the sport." (Maj. opn., *ante*, at p. 164.) According to the majority, "[s]ome of the most respected baseball managers and pitchers have openly discussed the fundamental place [that] throwing at batters has in their sport." (*Ibid.*) The majority acknowledges that those comments were made in the context of *professional* baseball. The majority then proceeds to hold that throwing at batters is a risk as inherent in college baseball as it is in professional baseball. My concerns are threefold.

First, the determination whether being hit by a pitched ball intentionally aimed at one's head is an inherent risk of baseball, whether professional or intercollegiate, is a question of fact to be determined in the trial court. "It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon *a record of matters which were before the trial court for its consideration.*' [Citation.] This rule reflects an 'essential distinction between the trial and the appellate court . . . that *it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law . . . .*' " (*In re Zeth S.* (2003) 31 Cal.4th 396, 405 [2 Cal.Rptr.3d 683, 73 P.3d 541], italics added.) Here, the trial court never heard, and thus never considered, the comments from professional baseball managers and pitchers on which the majority relies; indeed, not only did the District offer no evidence on this issue, but the District did not even *argue* that Avila's complaint was barred by the no-duty-for-sports rule. Undeterred, the majority has done its own research and made its own factual findings on this issue, thus invading the province of the trial court.

I recognize that this court must take judicial notice of "[f]acts and propositions of generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute." (Evid. Code, § 451, subd. (f); see also Evid. Code, § 452, subd. (h) [court may take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."].) But the majority's assertion that intentionally throwing a ball at a batter's head is inherent in intercollegiate baseball is not a fact so "universally known" that it "cannot reasonably be the subject of dispute." (Evid. Code, § 451, subd. (f).)

.

Had Avila been given the opportunity in the trial court, he might well have called expert witnesses who could have refuted the majority's factual determination that aiming at a batter's head is inherent in professional baseball. And he could have pointed to the official comments accompanying Major League Baseball's rule 8.02(d), which prohibits pitchers from trying to hit the batter: "To pitch at a batter's head is unsportsmanlike and highly dangerous. It should be—and is—condemned by everybody. Umpires should act without hesitation in enforcement of this rule." (Off. Rules of Major League Baseball, rule 8.02(d), off. coms.)

Alternatively, Avila could have called expert witnesses to refute the majority's finding, which is unsupported by any citation of authority, that the conduct in question is as inherent in intercollegiate baseball as it is in professional baseball. And he could have pointed out that, unlike the rules of professional baseball, the rules of the National Collegiate Athletic Association provide that a pitcher who intentionally throws at a batter is not only ejected from the game in which the pitch was thrown, but is also suspended for the team's next four games, and a pitcher who intentionally throws at a batter on three occasions must be suspended for the remainder of the season. (Nat. Collegiate Athletic Assn., NCAA Baseball Rules (Dec. 2005) rule 5, § 16(d).)

I turn to my second concern. This matter is here after an appeal from the trial court's order sustaining a demurrer. A demurrer "tests the pleading alone, and . . . lies only where the defects appear on the face of the pleading." (5 Witkin, Cal. Procedure, *supra*, Pleading, § 900, p. 358.) It raises only questions of *law*. (*Id.* at p. 357.) But by relying on the no-duty-for-sports rule to hold that the District's demurrer was properly sustained, the majority imposes on trial courts the obligation to decide—in ruling on a demurrer—a question of *fact*: that is, whether a particular sports injury arises from an activity inherent in the game. Questions of fact cannot be decided on demurrer, however; they must be decided on summary judgment or at trial. Thus, the no-duty-for-sports rule is unworkable because it forces trial courts to decide questions of *fact* at the demurrer stage when the only method available to them is suitable *only* for deciding questions of *law*.

My third concern is that the majority's application of the no-duty-for-sports rule to include pitches intentionally thrown at a batter's head is an ill-conceived expansion of that rule into intentional torts. In *Knight*, the plaintiff alleged only that the defendant acted *negligently* (*Knight v. Jewett, supra*, 3 Cal.4th at p. 318), and the plurality there justified the no-duty-for-sports rule with the comment that a baseball player should not be held liable "for an

injury resulting from a *carelessly* thrown ball or bat during a baseball game" (*ibid.*, italics added). Here, however, the majority applies that rule to hold that the trial court properly sustained the District's demurrer to Avila's cause of action alleging an *intentional tort*, in which he alleged that the pitch that hit him "was thrown in a deliberate retaliatory fashion, with reckless disregard for the safety of plaintiff." Even if I were to accept the majority's misguided no-duty-for-sports rule, I would apply it only to causes of action for negligence, not for intentional torts.

I would analyze Avila's claim under the traditional doctrine of assumption of risk. Under that doctrine, the pertinent inquiry is not what risk is inherent in a particular sport; rather, it is what risk the plaintiff consciously and voluntarily assumed. That issue, as I explained earlier, is not one involving a duty of care owed to another, to be resolved on demurrer; rather, it is an affirmative defense, to be resolved on summary judgment or at trial.

Under traditional assumption-of-risk analysis, "sports participants owe each other a duty to refrain from unreasonably risky conduct that may cause harm." (Comment, *Looking Beyond the Name of the Game: A Framework for Analyzing Recreational Sports Injury Cases, supra*, 34 U.C. Davis L.Rev. at p. 1060.) Intentionally hitting another person in the head with a hard object thrown at a high speed is highly dangerous and is potentially tortious, no matter whether the object is a ball thrown on a baseball field or is a rock thrown on a city street. Thus, if the District here was complicit in a decision by the pitcher to hit Avila in the head with the baseball, it may be held liable for Avila's injuries if Avila did not assume the risk that the pitcher would hit him in this manner. But, as I explained earlier, Avila has thus far not alleged that coaches employed by the District either advised or condoned any such act. Thus, the trial court properly sustained the District's demurrer; but Avila should be given leave to amend his original complaint to allege that the District was legally responsible for the pitcher's decision to aim the baseball at Avila's head.

If Avila were to amend his complaint to allege the District's complicity in the pitcher's decision to hit him in the head with the baseball, the District should be permitted to deny liability on the ground that Avila assumed the risk of an intentional hit in the head during the game: that is, he "voluntarily accepted [that] risk with knowledge and appreciation of that risk." (*Knight v. Jewett, supra*, 3 Cal.4th at p. 326 (dis. opn. of Kennard, J.).) Whether Avila assumed that risk is a question of fact that has no bearing on the District's duty of care toward Avila. Therefore, it cannot be decided on demurrer, but should be decided on a motion for summary judgment or at trial.

I would remand the matter to the Court of Appeal, and have that court direct the trial court to sustain Avila's demurrer with leave to amend the original complaint.