Filed 10/7/24  Grande v. Long Beach Unified School District CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| ALEXANDRA GRANDE, | B316228 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV14114) |
| v. | |
| LONG BEACH UNIFIED SCHOOL DISTRICT et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge.  Affirmed.

Law Office of Michael L. Justice and Michael L. Justice for Plaintiff and Appellant.

McCune & Harber, Dana John McCune and Dominic A. Quiller for Defendant and Respondent Long Beach Unified School District.

Disenhouse Law, Bruce E. Disenhouse and Gary O. Poteet, Jr., for Defendant and Respondent Rick Tyson.

———————————

# INTRODUCTION

Alexandra Grande sued Long Beach Unified School District (District) and coach Rick Tyson for negligence. She alleged that Tyson caused her to fall and tear her anterior cruciate ligament (ACL) after the District allowed Tyson to run as a pacesetter in the same race as Grande. The trial court granted respondents' summary judgment motions after concluding the primary assumption of risk doctrine barred Grande's negligence claims. We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *The All-comers Track Meet and 600-meter Race*

In December 2018, the District sponsored an all-comers track meet at Long Beach Poly High School. An all-comers track meet is typically held during the preseason for runners to practice. Runners of all ages and types can participate. Races are not limited by age or gender. For example, master level athletes (i.e., experienced runners) may run in any race they choose.[1] Individual races are generally organized by ability and availability. If there is room in a race, a master athlete typically may participate. In all-comers track meets, participants do not

---

[1]    Crystal Irving, the athletic director for Long Beach Poly High School, testified master level athletes were over 50 or 60 years old. Tyson believed master level athletes were over 35 years old, and he testified he typically observed master athletes who were over 40 years old participate in all-comers meets. In all events, it is undisputed such athletes were older than high school students.

2

pre-register, and the composition of races is based on who attends that day.

Grande was injured in a 600-meter race at the all-comers track meet. At the time, Grande was a junior at Valencia High School, and this was her first track meet of the season. Tyson ran in the race as a pacesetter, and all the other runners were high school females. The race started with a waterfall start, which meant the starting line curved upward starting in lane 1 and ending in lane 8. Part of the strategy to running a race with a waterfall start involved the runners merging into the inner lanes to gain an inside position. At the starting lineup, Grande positioned herself in lane 4. Tyson lined up between lanes 2 and 3 to Grande's left and behind her. There were two runners in between them. After the start of the race, Grande began to move from lane 4 toward the inside lanes. Video taken by Grande's father showed Grande fell when she was directly in front of Tyson near the beginning of the race.

B.      *Grande's Deposition Testimony*

Grande testified she believed Tyson caused her fall. At her deposition, she testified his right arm pushed into the back of her left shoulder, and then his right leg went into the back of her left knee, which made her fall and injure her ACL. Grande testified, "a girl that's my height and, you know, 5'4" or 5'5" and so on wouldn't have caused that much damage. I would have probably–we probably would have tripped up. I would have probably caught my fall if she was behind me. But since he was so big and large, I was clearly, like, tackled like a football player almost–if I were to describe it." Grande testified she was 16 years old at the time of the race and weighed 120 pounds.

Tyson, who was six feet one inch tall, estimated his weight to be between 235 and 245 pounds at the time of the race.

Grande testified she understood the rules of the race: "After the gun starts in a 600-meter race, you're allowed to cut in. The red coat official always gives out the rules of the race. . . . Everyone . . . is allowed to cut in once that gun starts. Meaning, you can . . . 'cut off' people, even though it's not really cutting off, you are merging into lane number one." Grande was coached not to cut in immediately "but to take off and to get out fast [to] avoid traffic and getting boxed in."

Grande further testified, "You assume the risk of–I guess you'd say impeding on another runner. But yeah, everyone knows that we could get elbowed; we could get tripped up in the beginning. Everyone knows that." As to the race in question, Grande testified she chose where to line up. She explained, "it's usually first come, first serve sometimes. But other [race officials] like to place runners on the waterfall start, accordingly, from either slowest to the fastest or fastest to the slowest; it really depends on the [race official]."

C.     *Tyson's Deposition Testimony*

Tyson was a track coach for West Ranch High School and held the same certification as a track coach for a Division 1 school. In college, he was All-American in the 600-meter and 400-meter races. He began coaching in 2010. Tyson attended the all-comers track meet with athletes from his school. Tyson testified he and other coaches agreed a pacesetter was needed in the 600-meter race because the runners were "taking off too fast" and "exhausting themselves the first third of the race." Tyson

4

testified he was the only coach willing and able to run as a pacesetter.

Crystal Irving, the head track coach and athletic director at the host school, approved Tyson's request to serve as pacesetter. Tyson recalled he shouted an announcement that he would be a pacesetter for the 600-meter race and that the race official made the same announcement at the beginning of the race. Grande, her father, and her coach denied hearing any such announcement by Tyson or anyone else. But they all saw Tyson line up, although they did not know why he was running. Tyson asked the race official where he should line up, and the official indicated Tyson had chosen a "good spot." Tyson testified he placed himself to provide visual and audio cues for the runners to understand whether to speed up, slow down, or stay where they were. Pacing is meant to help athletes establish a rhythm.

D.    *Additional Testimony*

Irving organized the all-comers track meet. She typically organized four to seven all-comers track meets a year and had done so for at least seven years. She confirmed she authorized Tyson to run in the 600-meter race as a pacesetter. Irving testified that in preseason meets official track and field rules do not always apply. For example, a runner who "jumps the gun" in the regular season is automatically disqualified, while he or she is merely given a warning in the preseason. Additionally, regular season meets separated boys and girls into different races, while preseason meets allowed mixed genders. These deviations from official rules allowed the runners to practice. Irving testified pacesetters were "absolutely" allowed in a preseason meet.

Grande's track coach, who witnessed the accident, concluded Grande did not violate any rules, but he faulted the District for allowing Tyson to line up as a pacesetter in the middle of the pack.

E.    *The Summary Judgment Motions*

Grande sued the District and Tyson for negligence.  Her complaint alleged the District was negligent because it allowed Tyson, "a rather large adult male," to run alongside teenaged girls, which unjustifiably increased the risk of harm ordinarily associated with a 600-meter race.  Grande's theory of liability was that Tyson's participation in the race increased the risk of harm beyond what was inherent in a race that allowed for runners to merge lanes.  She also alleged Tyson breached his duty of care to Grande by engaging in unnecessary and reckless behavior that increased the risk of harm.

The District and Tyson each moved for summary judgment arguing the assumption of risk doctrine barred Grande's claims.  Each argued Grande's injury was caused by an inherent risk of running in a race that involved a waterfall start and allowed all comers, who could be of different ages, genders, sizes, and skill levels.  In essence, both defendants argued they did not owe Grande a cognizable duty, which is an essential element of her negligence claim.

According to the District, Grande caused the accident by merging in front of Tyson.  It also argued she was injured by a collision, which Grande admitted was an inherent risk of a waterfall start, and that the District did not increase the risk of a collision by allowing Tyson to run in the race.  It further contended Grande admitted she would have collided with

6

someone else if Tyson had not run in the race. Tyson raised similar arguments in his motion for summary judgment, arguing Grande assumed the risk of a collision in a waterfall start at an all-comers track meet, which could include larger runners. The District and Tyson also argued imposing liability would fundamentally alter the nature of an all-comers track meet. As relevant here, they each presented deposition testimony and two videos of the 600-meter race.

To oppose the summary judgment motions, Grande presented deposition testimony from her coach and the declaration of an expert with experience as a track and field coach and athletic director. Grande's expert opined the District violated rule 4-6 of the National Federation of State High School Associations Track and Field and Cross Country Rules Book by allowing Tyson to act as a pacesetter. Rule 4-6 provides: "It is an unfair act when a competitor receives any assistance. Assistance includes: [¶] . . . [¶] b. Pacing by a teammate not in the race or persons not participating in the event." Grande's expert also concluded the District was negligent by failing to provide appropriate supervision and medical support at the track meet. She opined the race in which Grande was injured was overcrowded with 15 runners. After reviewing the video, the expert stated that Tyson unexpectedly stepped to the right as Grande was merging to the left. He made contact with her foot, and then his right arm pushed her in the back, causing her to fall. Grande also argued Tyson was careless because he testified he was unsure whether he lost his balance and was unaware that anyone had fallen until after the starter stopped the race.

The trial court granted summary judgment in favor of the District and Tyson. It held Tyson's presence in the race did not

7

increase the risks inherent in the sport simply because he was a coach or larger than the other runners. The court further observed the nature of an all-comers track meet meant a woman of Tyson's size and Grande's age could have participated in the race. As a result, Tyson's presence did not increase any inherent risk even assuming his presence violated a rule.

Grande timely appealed.

## DISCUSSION

Grande argues the trial court incorrectly applied primary assumption of the risk principles and that reversal is warranted because this is a secondary assumption of risk case. She also contends, among other things, that there are triable issues of fact whether Tyson or the District increased the risks inherent to the race. We conclude the primary assumption of risk doctrine applies and that Grande raised no material disputes that respondents increased the risks inherent to the race.

A.    *Summary Judgment Standard and Standard of Review*

Summary judgment is appropriate when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (See Code Civ. Proc., § 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.) We review the trial court's decision de novo. "In ruling on the motion, the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom ([Code Civ. Proc.,] § 437c, subd. (c)), and must view such evidence [citations] and such inferences [citations], in the

8

light most favorable to the opposing party." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843, fn. omitted (*Aguilar*).)

A defendant moving for summary judgment has the initial burden of presenting evidence that a cause of action lacks merit because the plaintiff cannot establish an element of the cause of action or there is a complete defense. (See Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra*, 25 Cal.4th at p. 853; *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1109.) If the defendant satisfies this initial burden, the burden shifts to the plaintiff to present evidence demonstrating there is a triable issue of material fact. (See § 437c, subd. (p)(2); *Aguilar*, at p. 850.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850.) Thus, a party "cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact." (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981.)

B.      *The Assumption of Risk Doctrine in Active Sports*

"To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.'" (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213.) A duty of care does not exist in every situation. (See *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 160-161 (*Avila*).) "'[T]he existence and scope' of the defendant's duty is" a question "of law to be decided by the

9

court, not by a jury, and therefore it generally is 'amenable to resolution by summary judgment.'" (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1004 (*Kahn*).) "When the injury is to a sporting participant, the considerations of policy and the question of duty necessarily become intertwined with the question of assumption of risk." (*Avila,* at p. 161.)

 *Knight v. Jewett* (1992) 3 Cal.4th 296, 308-309 (*Knight*), recognized two types of assumption of risk, primary and secondary. In primary assumption of risk cases, "a defendant owes no duty to protect the plaintiff from a particular risk of harm" and "the lack of a duty of care operates as a complete bar to recovery, without regard to whether the plaintiff's conduct was reasonable or unreasonable, and without regard to the plaintiff's subjective awareness or understanding of the potential risk." (*Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1632 (*Staten*).) By contrast, in secondary assumption of risk cases, "the defendant does owe a duty of care but the plaintiff knowingly encounters the risk," and in that situation "liability is apportioned by comparative fault." (*Ibid.*) In other words, "*primary* assumption of risk applies to the question of duty and *secondary* assumption of risk applies to the calculation of damages." (*Shin v. Ahn* (2007) 42 Cal.4th 482, 499 (*Shin*).)

 "Generally, the participation in an active sport is governed by primary assumption of risk, and a defendant owes no duty of care to protect a plaintiff against risks inherent in the sport." (*Staten, supra,* 45 Cal.App.4th at p. 1632; accord, *Knight, supra,* 3 Cal.4th at pp. 315-316, 320.) Whether a defendant owes a duty to plaintiff "'is a *legal* question which depends on the nature of the sport or activity in question and on the parties' general relationship to the activity.'" (*Staten*, at p. 1632.) That is, we

"determine the question of duty as a function of the scope and definition of a given active sport's inherent risks." (*Id*. at p. 1633.) "Judges deciding inherent risk questions under *Knight* may consider not only their own or common experience with the recreational activity involved but may also consult case law, other published materials, and documentary evidence introduced by the parties on a motion for summary judgment." (*Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1158 (*Nalwa*).) "The primary assumption of risk doctrine rests on a straightforward policy foundation:  the need to avoid chilling vigorous participation in or sponsorship of recreational activities by imposing a tort duty to eliminate or reduce the risks of harm inherent in those activities.  It operates on the premise that imposing such a legal duty 'would work a basic alteration—or cause abandonment' of the activity." (*Id.* at p. 1156.)

"In many active sport cases, this principal determination of the question of duty leads to a second duty analysis.  Although a defendant owes no duty to protect against the risks inherent in a sport, the defendant generally owes a duty not to *increase* the risks of the activity beyond the risks inherent in the sport. [Citation.]  This second determination of duty, however, still hinges upon the trial court's determination of the question of duty in the first instance, by defining the risks inherent in the sport at issue." (*Staten, supra*, 45 Cal.App.4th at p. 1633, citing *Knight, supra*, 3 Cal.4th at pp. 315-316; see also *Nalwa, supra,* 55 Cal.4th at p. 1154; *Avila, supra*, 38 Cal.4th at p. 161.)

Whether a duty exists also depends on the "role of the defendant whose conduct is at issue in a given case." (*Knight, supra*, 3 Cal.4th at p. 318.)  But operators and participants in active sports generally have no duty to eliminate risks inherent

11

to a particular sport, and only have a duty not to increase the risks of the activity beyond those inherent in the sport. (See *Nalwa, supra,* 55 Cal.4th at p. 1159; see, e.g., *Avila, supra,* 38 Cal.4th at p. 162 [inherent risk of being hit by a pitch in a baseball game]; *Knight,* p. 315 [inherent risk of injury resulting from "rough play" in touch football game]; *Olson v. Saville* (2024) 98 Cal.App.5th 1066, 1069 [surfer's failure to wear a leash while using a surfboard with sharp fins and "dropping in" on another surfer were inherent risks of surfing]; *Towns v. Davidson* (2007) 147 Cal.App.4th 461, 469 [inherent risk of injury from ski resort employee's fast and aggressive skiing resulting in collision].)

C.    *A Collision with a Runner Is an Inherent Risk of Running*

We first examine the risks inherent to the 600-meter race. The trial court essentially concluded that being tripped by another runner, including a larger runner, is an inherent risk of running in an all-comers race with a waterfall start, and that such risk cannot be eliminated without altering the fundamental nature of the sport. Indeed, a collision with another runner is an inherent risk of a race with a waterfall start because a runner's strategy entails merging into the inside lanes. A collision with a larger runner is also a risk inherent to an all-comers race where adults can race against teenagers. In this case, there is no dispute that an all-comers track meet includes runners of all ages, sizes, genders, skill levels, and types; if there is room in a race, a master level athlete typically may participate; the race at issue involved a waterfall start where runners attempt to merge into the inside lane. Grande testified to these facts, as did her father, Tyson, and Irving. Further, Grande testified that "everyone knows" "[y]ou assume the risk of . . . impeding on

12

another runner.  But yeah, everyone knows that we could get elbowed; we could get tripped up in the beginning."  Grande also testified that she could have collided with another person even if Tyson had not been in the race:  "I would have probably—we probably would have tripped up."

D.    *Tyson's Duty to Grande*

Grande does not meaningfully contest that collision with another runner is an inherent risk of running.  Instead, she argues Tyson increased the inherent risk due to his: size and weight; position in line; aggressive movement toward the front of the pack; and carelessness.  She also argues a dispute about whether track and field rules applied precludes summary judgment.  We examine these in the context of Tyson's role in the race.  (See *Knight, supra*, 3 Cal.4th at p. 318.)

1.    *Tyson as coparticipant*

"The overwhelming majority of the cases . . . have concluded that it is improper to hold a sports participant liable to a coparticipant for ordinary careless conduct committed during the sport."  (*Knight, supra*, 3 Cal.4th at p. 318.)  Coparticipants breach a duty of care to each other only if they "intentionally injure[ ] another player or engage[ ] in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport."  (*Id.* at p. 320.)  Reckless conduct involves a conscious course of action, with knowledge that a serious danger to others is involved, or the deliberate disregard of a high degree of probability an injury will occur.  (See *Mammoth Mountain Ski Area v. Graham* (2006) 135 Cal.App.4th 1367, 1373.)

13

Grande does not argue that Tyson's position, assertiveness, or lack of awareness constituted intentional or reckless conduct. Although Grande argues Tyson "essentially tackled" her and "fought his way through the pack," she does not contend this conduct was "so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight, supra*, 3 Cal.4th at p. 320 [co-participant's "rough play" during football game not reckless]; see *Cheong v. Antablin* (1997) 16 Cal.4th 1063 [skier unintentionally colliding with another skier not reckless].)

Grande argues that Tyson's presence as a pacesetter violated rule 4-6 of the National Federation of State High School Associations Track and Field and Cross Country Rules Book. But she does not explain how this purported violation creates a triable issue of fact regarding Tyson's duty to her. In any event, even if we assume the rule violation, "not every rule imposed by an organizer . . . in a recreational activity reflects a legal duty enforceable in tort." (*Nalwa, supra*, 55 Cal.4th at p. 1163; *Knight, supra*, 3 Cal.4th at pp. 318-319 ["even when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule"].) Grande asserts additional factual disputes exist as to: who caused the accident; where Tyson was positioned at the start (behind the runners or in their midst); whether anyone announced Tyson would run in the race; and which rules governing high school track and field events were enforced at the meet. But these are not material

14

because Grande does not contend these facts demonstrated Tyson intentionally injured her or was reckless.

### 2. *Tyson as coach or instructor*

In interscholastic athletic competition, "the host school and its agents owe a duty to home and visiting players alike to, at a minimum, not increase the risks inherent in the sport." (*Avila, supra*, 38 Cal.4th at p. 162.) *Avila* further stated that "Schools and universities are already vicariously liable for breaches by the coaches they employ, who owe a duty to their own athletes not to increase the risks of sports participation." (*Ibid*.; see also *Kahn, supra,* 31 Cal.4th at pp. 1005-1006 [student's swim coach]; *Tan v. Goddard* (1993) 13 Cal.App.4th 1528, 1534-1535 ["we deal with the duty of a coach or trainer to a student who has entrusted himself to the former's tutelage. . . . [T]he general rule is that coaches and instructors owe a duty of due care to persons in their charge."].) But it is undisputed that Tyson was not Grande's track coach.

Even assuming without deciding that Tyson was nominally in charge of Grande as a pacesetter, as discussed above, collision with a runner of Tyson's size and weight is an ordinary inherent risk of an all-comers race where adults may run with teenagers. Tyson's position in line, purportedly aggressive movements, and lack of awareness are all risks inherent to (rather than increased risks in) a race with a waterfall start, where runners are expected to merge into the inside lane. As stated, Grande testified she would have collided with another racer even if Tyson had not run in the race. Grande has not raised a triable issue

15

Tyson increased the risks already inherent in the race.[2]  (See *Lilley v. Elk Grove Unified School Dist*. (1998) 68 Cal.App.4th 939 [affirming summary judgment where student broke his arm while wrestling with coach]; *Honeycutt v. Meridian Sports Club, LLC* (2014) 231 Cal.App.4th 251, 259 [similar, where student injured knee in judo class and instructor held plaintiff's leg during kick]; *Bushnell v. Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525 [similar].)

E.     *The District's Duty to Grande*
       1.     *The District's duties as a host of the track meet*
*Avila* addressed the duty imposed on a host school in interscholastic competitions and held that a host school has a duty to a visiting athlete not to increase the inherent risks of participation in a sport.  (See *Avila, supra,* 38 Cal.4th at p. 162.) *Avila* was decided on demurrer, but it considered many of the arguments Grande raises.  Similar to Grande, the *Avila* plaintiff argued the host school breached its duty to him by:

---

[2]     Grande also argues Tyson's "shifting" testimony is an independent basis to deny his summary judgment motion, citing *Donchin v. Guerrero* (1995) 34 Cal.App.4th 1832.  *Donchin* reversed summary judgment in favor of the defendant because his declaration in support of his motion contradicted certain earlier statements.  (See *id.* at p. 1841.)  But Grande has not raised a similar triable issue because even assuming Tyson's deposition testimony was contradictory (regarding what announcements he made before the race, whether he had ever run in an all-comers meet, whether Grande's father admitted to Tyson that he did not cause the accident, and where he lined up at the start of the race), none of these purported contradictions are material.

16

(1) conducting a preseason baseball game in violation of "community college baseball rules"; (2) failing to control the home team's pitcher who injured Avila when he was up to bat; (3) failing to provide umpires to supervise and control the game; and (4) failing to summon or provide medical care. (See *Avila,* at pp. 153, 163.) The Supreme Court rejected these contentions.

First, it held that hosting the game only exposed the plaintiff to the ordinary inherent risks of the sport, notwithstanding a violation of unspecified baseball rules. Second, the host school owed no duty to prevent a pitcher from hitting a batter, even intentionally, because such conduct was a strategy commonly employed by pitchers and an inherent risk of the sport. Third, the school's failure to provide umpires did not increase the risks inherent in the game. *Avila* explained, "While the provision of umpires might—*might*—have reduced the risk of a retaliatory beanball, Avila has alleged no facts supporting imposition of a duty on the District to reduce that [inherent] risk." (*Avila, supra,* 38 Cal.4th at p. 166.) Finally, the court held the host school did not cause the plaintiff's injury and was not vicariously liable for its pitcher's conduct. Thus it had no duty to ensure the plaintiff received medical attention. (See *id.* at p. 167.) "[E]ven if the District were responsible for causing Avila's injury, at most it would have had a duty to ensure that Avila's coaches and trainers were aware he had been injured so they could decide how best to attend to him." (*Id.* at p. 168.)

2. *Grande presented no material dispute the District increased the ordinary inherent risks of the race*

As stated, as a host the District owed Grande a duty not to increase the risks inherent in the sport and to take reasonable

17

measures to minimize those risks as long as it could do so without altering the nature of the sport. (See *Avila, supra*, 38 Cal.4th at p. 162; *Kim v. County of Monterey* (2019) 43 Cal.App.5th 312, 327 ["A defendant moving for summary judgment in the assumed risk context must show, as a matter of law, that it did not unreasonably increase risks to the plaintiff over and above those inherent in the activity"].)

First, Grande argues the District increased the risk inherent in the all-comers race by allowing Tyson to run in the race without a prior announcement and to line up in the middle lanes rather than the outside lanes. Grande appears to fault the District for hosting an all-comers race and allowing all comers to race. *Avila* rejected a similar argument when it held that hosting the baseball game itself did not increase the risk inherent to the sport; rather, the risk Grande was exposed to was that inherent in the race she ran. Further, as discussed above, Tyson's presence in the race did not increase the inherent risk that Grande would collide with another runner. Imposing liability for allowing Tyson, a larger man, to run as a pacesetter in an all-comers race would alter the nature of the sport. As the trial court observed, "[i]f the court were to hold that a coach or a school can be held liable for allowing bigger people to run in track races, the 'All-Comers' meet becomes the 'Persons-of-Correct-Body type' meet."

That Grande did not hear anyone announce Tyson's participation in the race is immaterial to the assumption of risk analysis. (See *Knight, supra*, 3 Cal.4th at p. 313 ["If the application of the assumption of risk doctrine in a sports setting turned on the particular plaintiff's subjective knowledge and awareness, summary judgment rarely would be available in such

18

cases, for, as the present case reveals, it frequently will be easy to raise factual questions with regard to a *particular* plaintiff's *subjective* expectations as to the *existence* and *magnitude* of the risks the plaintiff voluntarily chose to encounter."].)  In all events, Grande admitted she observed Tyson line up at the start so she was aware of his presence.

Further, Grande does not explain how requiring larger runners to line up in the outside lanes would minimize the inherent risks of a race when merging—and the attendant risk of collision—is fundamental to a waterfall start.  Grande testified that a runner's placement was usually either first come, first served or was based on the speed of the participants (e.g., fastest to slowest or vice versa).  Relegating larger runners to the outside lanes would alter the nature of the sport by requiring a particular line up, regardless of a runner's speed.

Grande also contends permitting 15 runners on the track resulted in overcrowding, relying on her expert's opinion.  Grande's expert observed 15 runners in the 600-meter race and on this basis concluded that, "[n]ot breaking the race into two heats caused a dangerous situation with fifteen people at the starting line to run in the same race."  Neither Grande nor her expert, however, explain why the track could not accommodate 15 runners and how this number of runners increased the risk inherent to this type of race.  Nor does she present evidence demonstrating the typical number of runners in this type of race.

Lastly, Grande contends, as the *Avila* plaintiff did, that the District increased the inherent risks by failing to designate someone to supervise the race, ensure the runners' safety, prevent injuries, and provide medical support.  *Avila* rejected these arguments.  While a race official might—*might*—have

19

reduced the risk of a collision by prohibiting Tyson's participation or relegating him to an outside lane, we have explained the District had no duty under *Avila* to reduce the ordinary inherent risk of a collision occurring in an all-comers race with a waterfall start. Rather, "the host school and its agents owe a duty to home and visiting players alike to, at a minimum, not increase the risks inherent in the sport." (*Avila, supra*, 38 Cal.4th at p. 162.) Nor does the lack of medical support raise a triable issue. Under *Avila,* the District "at most" would have had a duty to ensure that Grande's coach and father were aware she had been injured so they could decide how best to treat her. Grande does not contend her coach or her father were unaware of her injury, particularly given that Grande's father videotaped her fall.

> 3. *Grande does not demonstrate secondary assumption of the risk applies to this case*

Grande does not persuasively demonstrate that secondary assumption of the risk applies to this case. As stated, "*primary* assumption of risk applies to the question of duty and *secondary* assumption of risk applies to the calculation of damages." (*Shin, supra*, 42 Cal.4th at p. 499.) And in this appeal, we are concerned with the existence and scope of the District's duty. Further, the cases Grande relies on do not help her.

In each of Grande's cases, the court held primary assumption of risk did not apply because the risk complained of was not an inherent risk to the sport, or the application of a standard duty of care would not fundamentally alter the sport. (See *Hemady v. Long Beach Unified School Dist.* (2006) 143 Cal.App.4th 566, 578 [being hit in the head by a golf club was not an inherent risk of playing golf; reducing the number of

20

students and providing more supervision in a physical education class would not chill a coach's role to challenge a student nor would it discourage vigorous participation by fellow students]; *Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173, 179 [holding a duty to provide adequate water and electrolyte fluids when the marathon race organizer represented to the participants that these will be available at specific locations throughout the marathon does not alter the nature of the sport]; *Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, 134 [golf course owner's duty to provide a reasonably safe golf course that minimizes the risk of being hit by an errant ball does not alter the nature of the sport].)  Unlike these cases, here the risk Grande complains of—colliding with another runner, even one larger than her—is an ordinary risk that was inherent to the race she ran.[3]  (See *Nalwa, supra,* 55 Cal.4th at p. 1163, fn. 7 [distinguishing cases, including *Saffro,* as "addressing the duty to reduce *extrinsic* risks of an activity"].)

### 4.    *Tyson as the District's agent*

Grande asserts the District "is vicariously liable for Tyson's breaches of his duty(ies) [*sic*] to plaintiff."  But she provides no evidence or legal authority in support, forfeiting the argument. (See *Lee v. Kim* (2019) 41 Cal.App.5th 705, 721 (*Lee*).)  It is undisputed Tyson worked for a different school district.  But even assuming that Tyson acted as the District's agent when he ran as

---

[3]    Grande also relies on *Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, but that case is inapposite because it did not address the assumption of the risk doctrine outlined in *Knight, supra,* 3 Cal.4th 296.

21

pacesetter, he did not increase the risks inherent in the race for the reasons discussed above.

5.      *The exclusion of certain expert opinions*

Grande argues the trial court erred when it sustained objections to three paragraphs in her expert's declaration.[4]  As relevant here, Tyson and the District objected on the grounds of legal conclusion and improper expert opinion.  We conclude the trial court did not err.[5]  "'In the context of assumption of risk, the role of expert testimony is more limited.  "It is for the court to decide whether an activity is an active sport, the inherent risks of that sport, and whether the defendant has increased the risks of the activity beyond the risks inherent in the sport."  [Citation.]  A court in its discretion could receive expert factual opinion to

---

[4]      Specifically, these paragraphs stated:  "53.  Also, given Tyson's size, he is what is known as an unmatched or mismatched opponent. The size disparity between Tyson and the teenage girls alone tends to increase the risk of harm.  [¶] 54.  Further, Alexandra Grande and David Grande testified that they never heard the announcement that Tyson intended to run as a pace setter with the teenage girls registered to run in the race.  As such, the warning or announcement, if it was indeed actually made, was inadequate.  [¶]  55.  Crystal Irving, as meet director, unreasonably increased the risk of harm ordinarily associated with running a 600-meter race by allowing Rick Tyson to participate in a waterfall start with fifteen runners."

[5]      The Supreme Court has expressly declined to consider "whether a trial court's rulings on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535.)  Our conclusion remains the same under either standard.

22

*inform* its decision on these issues, particularly on the nature of an unknown or esoteric activity, but in no event may it receive expert evidence on the ultimate legal issues of inherent risk and duty.'" (*Willhide-Michiulis v. Mammoth Mountain Ski Area, LLC* (2018) 25 Cal.App.5th 344, 354 [excluding expert opinion that ski resort's snow grooming practices "'increase[d] the risk of collision and injury'"]; see also *Towns v. Davidson* (2007) 147 Cal.App.4th 461, 472 [excluding expert opinion that collision "'was caused by Davidson skiing so reckless as to be well outside the range of the ordinary activity involved in the sport of skiing.'"].)  Running is not an esoteric sport, and the excluded expert opinions improperly impinged on the role of the court.

6.      *Grande's procedural arguments*

Grande makes two procedural arguments.  First, she contends the District erroneously relied on the original complaint rather than the operative first amended complaint in its moving papers.  Second, Grande argues the District's "fatally defective" separate statement of material facts is an independent basis for reversal.  Both issues are forfeited.  Although Grande raised both issues before the trial court, she provided no reasoned argument or supporting authority.  "Although we examine the trial court's decision independently, the scope of our review is limited to those issues that have been adequately raised and supported in the appellant's brief." (*Lee, supra*, 41 Cal.App.5th at p. 721; see also *In re A.C.* (2017) 13 Cal.App.5th 661, 672 ["'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as [forfeited].'"].)

In all events, Grande does not argue the District's motion failed to seek summary judgment on any material issue. Nor does she explain how this error affected her ability to oppose the summary judgment motion, particularly when Tyson's substantially identical summary judgment motion correctly relied on the first amended complaint. Further, the legal claims asserted and the factual allegations in both of her complaints are largely identical. Under these circumstances, Grande has not demonstrated she was prejudiced by any such error. (See *Smith v. Smith* (2012) 208 Cal.App.4th 1074, 1078.)

And as to the separate statement, although her opposition papers "noted each and every inaccuracy, misquote, and statement taken out of context," the trial court did not deny summary judgment on this basis. We assume without deciding the trial court determined the separate statement was not fatally defective and provided undisputed evidence supporting summary judgment against Grande. The court did not abuse its discretion. (See *Brown v. El Dorado Union High School Dist.* (2022) 76 Cal.App.5th 1003, 1020 [no abuse of discretion where plaintiff did not explain how the alleged deficiency in the defendant's separate statement impaired his ability to demonstrate that material facts were in dispute]; *Truong v. Glasser* (2009) 181 Cal.App.4th 102, 118 [no abuse of discretion in not denying summary judgment motion for violating summary judgment rules where facts critical to the ruling were adequately identified, and plaintiffs did not explain how the procedural violations impaired their ability to marshal evidence of disputed material facts].)

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to recover their costs on appeal.

MARTINEZ, P. J.

We concur:

FEUER, J.

STONE, J.

25